# MANUEL *v.* WULFF.

ERROR TO THE SUPREME COURT OF THE STATE OF MONTANA.

No. 214. Submitted January 17, 1894. — Decided March 26, 1894.

A deed of a mining claim by a qualified locator to an alien operates as a transfer of the claim to the grantee, subject to question in regard to his citizenship by the government only.

If, in a contest concerning a mining claim, under Rev. Stat. § 2326, one party, who is an alien at the outset, becomes a citizen during the proceedings and before judgment, his disability under Rev. Stat. § 2319 to take title is thereby removed.

This was an action in the ordinary form of a contest between two claimants of a quartz lode mining claim upon the lands of the United States to determine the right to proceed in the United States land office for patent therefor. Moses Manuel, defendant below, made application in the land office at Helena, Montana, for a patent for the Marshal Ney lode mining claim, which application Iver Wulff, plaintiff below, adversely contested, basing his contest upon his right to the premises by virtue of their location and possession as the Columbia mining claim. This proceeding was thereupon commenced in the District Court for Lewis and Clarke County of the Territory of Montana, in accordance with section 2326 of the Revised Statutes.

The title of plaintiff was put in issue by the pleadings and the defendant filed a counter claim charging that the Columbia

lode location was forfeited by reason of the want of required annual work, and that the ground in controversy was unoccupied public domain at the time of the location of the Marshal Ney. This was denied by plaintiff in his replication.

Upon the trial it appeared that Henry Pflaume, who was a citizen of the United States, located the Columbia lode mining claim, July 1, 1882; that November 1, 1885, he conveyed the claim to Fred. Manuel by deed, and that November 30, 1887, Fred. Manuel conveyed the same property by deed to Iver Wulff, the plaintiff; that one Alfred Manuel, who was a citizen of the United States, located the same mining claim under the name of the "Marshal Ney," (claiming that the Columbia lode location had been abandoned and forfeited for the reason that no work was done thereon during the years 1883 and 1884,) and conveyed to Moses Manuel, the defendant, a one-third interest therein, October 12, 1885, and the remaining two-thirds, October 15, 1887, by deeds duly executed and recorded.

It further appeared that Moses Manuel was born in Canada and came to this country when about eight years old with his father, whom he supposed had been naturalized, and that he was thus a citizen of the United States. But the court held that he was not a citizen, whereupon he was naturalized, pending the trial, under the provisions of section 2167 of the Revised Statutes. The District Court then non-suited defendant upon his counter claim, and did not permit him to proceed with his case, upon the ground that he was not a citizen at the time that Alfred Manuel executed to him the deeds of conveyance of the Marshal Ney lode mining claim and at the time the suit was commenced, holding that the attempt on the part of Alfred Manuel to convey the mining claim operated as an abandonment thereof. Defendant then moved that plaintiff be non-suited, which motion was denied, but the question raised in respect thereof need not be examined here. Judgment was thereupon given in favor of Wulff, and defendant took the case by appeal to the Supreme Court of the State, (which had been admitted into the Union in the meantime,) by which the judgment was affirmed. The opinion of the

court will be found reported in 9 Montana, 279. The case was then brought to this court by writ of error.

*Mr. John B. Clayberg*, for plaintiff in error, submitted on his brief.

No appearance for defendant in error.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

The Supreme Court of Montana recognized the settled rule that an alien may take and hold land by purchase until office found, and that, if the alien become a citizen before his alienage has been adjudged, the act of naturalization takes effect by relation; but held that " possessory rights to mining claims on the public domain of the United States," although " endowed with the qualities of real estate to a high degree," did not come within that rule.

The argument was that as by statute mineral lands are not open to exploration, occupation, or purchase by aliens, but only by citizens of the United States and those who have declared their intention to become such, upon compliance with the laws and local mining rules and regulations as to location and possession, title and possessory rights to mining claims thus acquirable solely by virtue of the statute and in the manner prescribed thereby, must be regarded as passing as by operation of law, and not as by grant. Hence that mining claims are controlled by the rule which forbids the alien to take or hold real estate by descent, since it is the rule of law and not the act of the party that vests title in the heir, and it would be an idle thing to vest title by one act of law and then take it away by another. The court was of opinion that upon principle the analogy between an alien heir claiming by descent and an alien miner claiming under the mining laws was complete; and that as Moses Manuel was incapable of taking, the conveyance to him by Alfred Manuel, who was a citizen, amounted to an abandonment by the latter. We are unable to concur in this view. We do not think that the

transfer of a mining claim by a qualified locator to an alien is to be treated as *ipso facto* an abandonment or that the analogy of such a case to the casting of descent upon an alien can be maintained.

Among the cases often referred to upon the general subject and cited by the Montana Supreme Court is *Governeur* v. *Robertson*, 11 Wheat. 332, 350, 354. That was an action of ejectment and the facts these : Plaintiff claimed under one Brantz, who, being an alien, obtained, October 11, 1784, two grants from the Commonwealth of Virginia, of lands lying in Kentucky. He became naturalized in Maryland, November 8, 1784, and his title was confirmed to him and to his heirs and their grantees by the legislature of Kentucky in 1796 and 1799. Defendant claimed under a grant of Virginia made to a citizen in 1785.

This court, speaking by Mr. Justice Johnson, among other things, said :

" On this subject of relation, the authorities are so ancient, so uniform, and universal, that nothing can raise a doubt that it has a material bearing on this cause, but the question whether naturalization in Maryland was equivalent to naturalization in Kentucky. To this the articles of confederation furnish an affirmative answer, and the defendant has not made it a question. Nor, indeed, has he made a question on the subject of relation back; yet it is not easy to see how he could claim the benefit of an affirmative answer on the question he has raised, without first extricating his cause from the effects of the subsequent naturalization, upon the rights derived to Brantz through his patent. The question argued, and intended to be exclusively presented here, is, whether a patent for land to an alien, be not an absolute nullity.

" The argument is, that it was so at common law, and that the Virginia land laws, in some of their provisions, affirm the common law on this subject.

" We think the doctrine of the defendant is not to be sustained on either ground. . . .

" It is clear, therefore, that this doctrine has no sufficient sanction in authority ; and it will be found equally unsupported by principle or analogy.

" The general rule is positively against it, for the books, old and new, uniformly represent the King as a competent grantor in all cases in which an individual may grant, and any person *in esse*, and not *civiliter mortuus*, as a competent grantee. Femes covert, infants, aliens, persons attainted of treason or felony, clerks, convicts, and many others, are expressly enumerated as competent grantees. (Perkins, Grant, 47, 48, 51, etc.; Comyn's Dig. Grant, B. 1.) It behooves those, therefore, who would except aliens, when the immediate object of the King's grant, to maintain the exception.

" It is argued that there is an analogy between this case and that of the heir, or the widow, or the husband, alien; no one of whom can take, but the King shall enter upon them without office found. Whereas, an alien may take by purchase and hold until divested by office found. It is argued, that the reason usually assigned for this distinction, to wit, *nil frustra agit lex*, may, with the same correctness, be applied to the case of a grant by the King to an alien, as to one taking by descent, dower, or curtesy : That the alien only takes from the King to return the subject of the grant back again to the King by escheat. But, this reasoning obviously assumes as law the very principle it is introduced to support; since, unless the grant be void, it cannot be predicated of it that it was executed in vain. It is also inconsistent with a known and familiar principle in law, and one lying at the very root of the distinction between taking by purchase and taking by descent. It implies, in fact, a repugnancy in language. Since the very reason of the distinction between aliens taking by purchase, and by descent, is, that one takes by deed, the other by act of law ; whereas a grantee, *ex vi termini*, takes by deed, and not by act of law. If there is any view of the subject in which an alien, taking under grant, may be considered as taking by operation of law, it is because the grant issues, and takes effect, under a law of the State. But this is by no means the sense of the rule, since attaching to it this idea would be to declare the legislative power of the State incompetent to vest in an alien even a defeasible estate.

" That an alien can take by deed, and can hold until office

found, must now be regarded as a positive rule of law, so well established, that the reason of the rule is little more than a subject for the antiquary."

The objection here rests, however, on the assumption that Congress has not intended to confer any estate in respect of claims of this character because the right of purchase and the right of possession are indivisible, and the validity of the location is destroyed on the transfer of the claim to a person not authorized to keep the location alive. *Tibbitts* v. *Ah Tong*, 4 Montana, 536. Of course, the same qualification required in those who may purchase is required as to those who may possess, but that, in our judgment, does not render possessory rights any the less property susceptible of distinct ownership, nor involve the consequence that their transfer to unqualified persons would operate a forfeiture *eo instanti* as for a violation of a continuing condition precedent so that the removal of the disqualification would not cure the defect. If it could be properly held that the qualification of his grantee should be regarded as at all a condition annexed to the ownership of the qualified locator, such condition would be a condition subsequent, and governed by the rule laid down in *Schulenberg* v. *Harriman*, 21 Wall. 44.

Section 2319 of the Revised Statutes is as follows: "All valuable mineral deposits in lands belonging to the United States, both surveyed and unsuryeyed, are hereby declared to be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States and those who have declared their intention to become such, under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States."

And by section 2322, it is provided that when such qualified persons have made discovery of mineral lands and complied with the law, they shall have the exclusive right to possession and enjoyment of the same. It has, therefore, been repeatedly held that mining claims are property in the fullest sense of the word, and may be sold, transferred, mortgaged, and

inherited without infringing the title of the United States, and that when a location is perfected, it has the effect of a grant by the United States of the right of present and exclusive possession. *Forbes* v. *Gracey*, 94 U. S. 762; *Belk* v. *Meagher*, 104 U. S. 279; *Gwillim* v. *Donnellan*, 115 U. S. 45; *Noyes* v. *Mantle*, 127 U. S. 348.

This being so, we are of opinion on this record that, as Alfred Manuel was a citizen, if his location were valid, his claim passed to his grantee, not by operation of law, but by virtue of his conveyance, and that the incapacity of the latter to take and hold by reason of alienage was, under the circumstances, open to question by the government only. Inasmuch as this proceeding was based upon the adverse claim of Wulff to the application of Moses Manuel for a patent, the objection of alienage was properly made, but this was as in right and on behalf of the government, and naturalization removed the infirmity before judgment was rendered.

In the Matter of *Krogstad*, 4 Land Dec. 564, Mr. Justice Lamar, when Secretary of the Interior, ruled that, an alien having made homestead entry and subsequently filed his intention to become a citizen, the alienage at time of entry, in the absence of an adverse claim, would not defeat the right of purchase. *Jackson* v. *Beach*, 1 Johns. Cas. 399; *Governeur* v. *Robertson*, 11 Wheat. 332; and *Osterman* v. *Baldwin*, 6 Wall. 116, were cited to the point that naturalization has a retroactive effect, so as to be deemed a waiver of all liability to forfeiture and a confirmation of title. This seems to have long been the settled rule in the Land Department; *Man* v. *Huk*, 3 Land Dec. 452; *Lord* v. *Perrin*, 8 Land Dec. 536; so that if there had been no adverse claim in the land office, Moses Manuel's application, which appears, in respect of this question, to have been made in good faith, would not have been rejected on the mere ground of alienage when he made it. And as Moses Manuel was the grantee of a qualified locator, and became naturalized before the order, we conclude that there was error in the direction of a nonsuit.

*The judgment of the Supreme Court of Montana is reversed, and the cause remanded with a direction to reverse the*

*judgment of the court below and for further proceedings in conformity with this opinion.*

MR. JUSTICE WHITE, not having been a member of the court when this case was considered, took no part in its decision.