## ST. LOUIS MINING AND MILLING COMPANY *v.* MONTANA MINING COMPANY.

### ERROR TO THE SUPREME COURT OF THE STATE OF MONTANA.

No. 305. Submitted October 10, 1898. — Decided October 31, 1898.

The court again holds that when there is color for a motion to dismiss on the ground that no Federal question was involved in a judgment of a state court, this court may, under a motion to dismiss or affirm, dispose of the case.

When a location is made of a mining claim, the area becomes segregated from the public domain and the property of the locator, and he may sell

it, mortgage it or part with the whole or any portion of it as he may see fit; and a contract for such sale is legal and will be enforced by the court.

Where an application to enter a mining claim embraces land claimed by another, the latter is under no obligation to file an adverse claim; but he may make a valid settlement with the applicant by contract, which can be enforced against him after he obtains his patent.

THIS was a suit for specific performance brought by the Montana Mining Company against the St. Louis Mining and Milling Company of Montana and Charles Mayger in the district court of the First Judicial District of the State of Montana, in and for the county of Lewis and Clarke.

The complaint alleged that on March 7, A.D. 1884, plaintiff's predecessors in interest, Robinson, Huggins, Sterling, De Camp and Eddy, were the owners of, and in possession, and legally entitled to the use, occupation and possession, of a certain portion of the Nine Hour Lode and Mining Claim, which embraced in all an area of 12,844.5 feet, together with the minerals therein contained.

That Mayger applied to the United States land office at Helena for a patent to the St. Louis Lode Mining Claim, owned by him, and that in the survey he caused to be made of his claim he included that part of the Nine Hour Lode Mining Claim described in the complaint, whereupon an action was commenced by Robinson and Huggins against Mayger in the district court of the Third Judicial District of the then Territory of Montana to determine the right to the possession of the particular premises. That on said seventh of March, for the purpose of settling and compromising that action, and settling and agreeing upon the boundary lines between the Nine Hour Lode Mining Claim and the St. Louis Lode Mining Claim, Mayger made, executed and delivered to Robinson, Huggins and Sterling a certain bond for a deed, whereby, in consideration of the compromise and settlement of the action and the withdrawal of the protest and adverse claim, he covenanted and agreed that when he should obtain a patent as applied for, he would, on demand, make, execute and deliver to Robinson, Huggins and Sterling, or their assigns, a good

and sufficient deed for the premises described in the complaint; and thereupon Robinson, Huggins and Sterling dismissed their said action, withdrew their adverse claim, and performed all of the conditions of the bond on their part.

That Mayger then proceeded with his application and obtained a patent, but that he gave no notice to plaintiff, or any of its predecessors in interest, of the obtaining of the patent until some time in November, 1889.

That when the bond for a deed was executed, plaintiff's predecessors in interest were in possession of the premises, and have ever since been and are yet in possession thereof, holding and using the same as a part of the Nine Hour Lode Claim; that by mesne conveyances the title to this claim, including the portion in dispute in this suit, had come to plaintiff; that it is entitled to a conveyance of the premises from Mayger; that Mayger, on or about June 10, 1893, assumed to convey said piece of ground to the St. Louis Mining and Milling Company, which then had full knowledge and notice of the making, execution and delivery of the bond for a deed by Mayger, and of the rights and equities of the Montana Mining Company thereunder; that the St. Louis Company has instituted a number of suits in the Circuit Court of the United States, in which it claims that it is the owner of the premises described in the complaint, and also the right to recover certain sums of money for ores alleged to have been wrongfully extracted therefrom. The bond referred to was appended to the complaint. The prayer was that the court should decree that defendants should convey to plaintiff a good and sufficient deed to the premises in controversy.

The answer denied all the material allegations of the complaint, and affirmatively alleged that the adverse claim interposed to the application of Mayger for a patent was for the purpose of harassing and hindering Mayger in obtaining a patent to his mining claim, and that the bond was given contrary to equity, good conscience and public policy.

The case was tried by the district court without a jury, and the court made and filed findings of fact and conclusions of law. It was found that plaintiff's predecessors in interest

were at the time mentioned in the complaint the owners of, in possession, and entitled to the possession, of the Nine Hour Lode Mining Claim as described, and that the strip of ground in dispute was at the time and continued to be a part of said claim; that the bond was executed and delivered by Mayger to the parties therein named, binding Mayger to convey to them or their assigns the ground in question when Mayger obtained a patent therefor; that it was given as a compromise and settlement of the controversy as to the land now in dispute, and then in litigation between the parties, and for the purpose of fixing and determining the boundary line between the Nine Hour Lode Mining Claim and the St. Louis Mining Claim, as alleged in the complaint, and that Mayger thereafterwards did obtain a patent covering the premises in dispute; that plaintiffs in the adverse mining suit, on the execution to them of the bond by Mayger, dismissed their action and performed all the conditions of the contract on their part; that at the time of the execution of the bond the predecessors of plaintiff were in actual possession of the ground in dispute, and that they and plaintiff have ever since remained in possession thereof, claiming and holding the same as a part of the Nine Hour Lode Mining Claim; that at the date of the execution and delivery of the bond, it was expressly agreed between the parties thereto that all of the ground lying to the east of the westerly line of the strip should be a portion of the Nine Hour Lode Mining Claim; that plaintiff is the successor in interest of Robinson, Huggins and Sterling, the obligees named in the bond, and also of De Camp and Eddy, who were cotenants with said obligees in the premises at the date of the execution of the bond; that the mesne conveyances introduced in evidence on the part of plaintiff embraced and were intended to include the ground in question, and conveyed to the grantees therein named all of the interest, legal and equitable, which the grantor or grantors had in said premises, covering as well their interest in the ground in dispute as in every other part and parcel of the Nine Hour Lode Mining Claim.

That in July, 1893, plaintiff duly demanded a deed to the

ground in dispute from defendants, which defendants refused to execute; that in June, 1893, Mayger assumed to convey the controverted ground to the St. Louis Mining and Milling Company, but that at the date of his conveyance the St. Louis company had full notice and knowledge of plaintiff's equities in and to the disputed strip, and of its possession thereof; that defendants wrongfully asserted title to the ground in controversy, and thereby clouded plaintiff's title thereto, which cloud plaintiff had a right to have removed.

The district court concluded as matter of law that plaintiff was entitled to the conveyance prayed for, and that defendants should be enjoined from asserting any right, title or interest in or to the ground in dispute, and from in any manner interfering with the possession or enjoyment thereof by plaintiff.

In accordance with the findings of fact and conclusions of law, a decree was entered for plaintiff, and defendants appealed to the Supreme Court of the State of Montana, by which it was affirmed. 51 Pac. Rep. 824.

This writ of error was then sued out, and defendants in error now move to dismiss the writ, or that the decree be affirmed.

Mr. A. B. Browne on behalf of Mr. Charles J. Hughes, Jr., and Mr. W. E. Cullen submitted their brief in support of the motion.

Mr. W. W. Dixon, Mr. Thomas C. Bach and Mr. Edwin W. Toole opposing.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

While it is conceded by plaintiffs in error that there is no express prohibition on the transaction involved in the record, it is contended that the contract was contrary to the policy of the law, and that the question thus raised is necessarily a Federal question. Granting that this is so, and that the

motion to dismiss must, therefore, be overruled, we are of opinion that there was color for the motion, and that the case may properly be disposed of on the motion to affirm.

The Supreme Court of Montana ruled that, in the absence of statutory prohibition, there was no reason in law or equity why the contract sought to be enforced should be held illegal, and we concur in this disposition of the Federal question suggested.

The public policy of the Government is to be found in the Constitution and the laws, and the course of administration and decision. *License Tax cases,* 5 Wall. 462; *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290, 340.

The proposition of plaintiffs in error is that where an application to enter a mining claim is made, and there is embraced therein land claimed by another, it is the duty of the latter to file an adverse claim and thereafter bring in some court of competent jurisdiction an action to determine the right to the area in conflict, which action must be prosecuted to a final judgment or dismissed; and that no valid settlement can be made by which such adverse claimant can acquire any interest in the ground when thereafter patented by the applicant. We are not aware of any public policy of the Government which sustains this proposition.

Where there is a valid location of a mining claim, the area becomes segregated from the public domain and the property of the locator. There is no inhibition in the Mineral Lands Act against alienation, and he may sell it, mortgage it or part with the whole or any portion of it as he may see fit. *Forbes* v. *Gracey,* 94 U. S. 762, 766; *Manuel* v. *Wulff,* 152 U. S. 505, 510; *Black* v. *Elkhorn Mining Company,* 163 U. S. 445, 449.

The location of the Nine Hour Lode was in all respects sufficient and valid. When the dispute afterwards arose between Robinson and Mayger as to a portion of it, there was nothing to compel the filing of an adverse claim. The settlement made gave Robinson an equitable title immediately, and ultimately he was to have the complete legal title, to a piece of ground, which it seems rightfully belonged to him. The Government was not defrauded in any way, nor

was there any legal or moral fraud involved in the transaction. The settlement and adjustment of the dispute with reference to the right of possession appears upon its face to to have been satisfactory to the parties when made, and should be upheld unless contravening some statute or some fundamental principle of law recognized as the basis of public policy. There was no such statute, and settlements of matters in litigation, or in dispute, without recourse to litigation, are generally favored, and are apparently of frequent occurrence in regard to mining land claims; nor is there anything in the decisions of this court to throw doubt on their validity.

In *Ducie* v. *Ford*, 138 U. S. 587, a contract of the character of that under consideration was passed on in a suit brought to enforce its specific performance, and it was assumed that the contract was not void as in contravention of any statute of the United States, or contrary to public policy. In *Meyers* v. *Croft*, 13 Wall. 291, this court was asked to hold that the prohibition against alienation found in the last clause of the twelfth section of the preëmption act of 1841 extended from the date of entry to the actual issue of patent. This the court declined to do, and decided that the object of the act was attained when the preëmptor went with clean hands to the land office and proved up and paid for his land. And the court said : "Restrictions upon the power of alienation after this would injure the preëmptor, and would serve no important purpose of public policy. It is well known that patents do not issue in the usual course of business in the general land office until several years after the certificate of entry is given, and equally well known that nearly all the valuable lands in the new States, admitted since 1841, have been taken up under the preëmption laws, and the right to sell them freely exercised after the claim was proved up, the land paid for, and the certificate of entry received. In view of these facts we cannot suppose, in the absence of an express declaration to that effect, that Congress intended to tie up these lands in the hands of the original owners, until the Government should choose to issue the patent."

In *Davenport* v. *Lamb*, 13 Wall. 418, a covenant made by certain grantors " that if they obtain the fee simple to said property, from the Government of the United States, they would convey the same to the grantee, his heirs or assigns, by deed of general warranty," made with reference to a tract of land taken up under what was known as the Oregon Donation Act, was upheld although the point that the covenant was against public policy was distinctly made.

In *Lamb* v. *Davenport*, 18 Wall. 307, 314, Mr. Justice Miller, speaking of claims under that act, said: " They were the subjects of bargain and sale, and, as among the parties to such contracts, they were valid. The right of the United States to dispose of their own property is undisputed, and to make rules by which the lands of the Government may be sold or given away is acknowledged ; but, subject to these well known principles, parties in possession of the soil might make valid contracts, even concerning the title, predicted upon the hypothesis that they might thereafter lawfully acquire the title, except in cases where Congress has imposed restrictions on such contracts."

And to the same effect see *Gaines* v. *Molen*, 30 Fed. Rep. 27, where the subject was considered by Mr. Justice Brewer, then Circuit Judge.

*Anderson* v. *Carkins*, 135 U. S. 483, 487, involved a contract made by a homesteader to convey a portion of a tract when he should acquire title thereto from the United States, and was disposed of on different grounds. It was stated in the opinion that : " The theory of the homestead law is that the homestead shall be for the exclusive benefit of the homesteader. Section 2290 of the Revised Statutes provides that a person applying for the entry of a homestead claim shall make affidavit that, among other things, 'such application is made for his exclusive use and benefit, and that his entry is made for the purpose of actual settlement and cultivation, and not either directly or indirectly for the use or benefit of any other person.' And section 2291, which prescribes the time and manner of final proof, requires that the applicant make 'affidavit that no part of such land has been alienated, except

as provided in section twenty-two hundred and eighty-eight,' which section provides for alienation for 'church, cemetery or school purposes, or for the right of way of railroads.' The law contemplates five years' continuous occupation by the homesteader, with no alienation except for the named purposes. It is true that the sections contain no express prohibition of alienation, and no forfeiture in case of alienation; yet, under them the homestead right cannot be perfected in case of alienation, or contract for alienation, without perjury by the homesteader. . . . There can be no question that this contract contemplated perjury on the part of Anderson, and was designed to thwart the policy of the Government in the homestead laws, to secure for the benefit of the homesteader the exclusive benefit of his homestead right."

In the case at bar there was no statute which, in express terms, or by any fair implication, forbade the making of such a contract as that proceeded on here.

*Decree affirmed.*