SHEA et al. v. NILIMA et al.

(Circuit Court of Appeals, Ninth Circuit. October 10, 1904.)

No. 1,012.

1. MINING—PARTNERSHIP AGREEMENT FOR LOCATING CLAIMS—STATUTE OF FRAUDS.

An agreement between two or more persons to explore the public domain, and to locate a mining claim or claims for the joint benefit of the contracting parties, is not within the statute of frauds, and need not be in writing; and if, in pursuance of the agreement, one of the parties locates the claim in his own name, he holds the legal title to the interests of the others in trust for them.

2. PARTNERSHIP—EVIDENCE TO ESTABLISH—ORAL AGREEMENT.

In determining whether the relation between the parties to an oral agreement constitutes a partnership, their intention as disclosed by the nature and effect of the whole agreement and acts done thereunder must govern.

3. PLEADING—SUFFICIENCY OF COMPLAINT.

Where a complaint states the substantial facts which constitute a cause of action, or they can be inferred by reasonable intendment from the matters set forth, it will be held sufficient, in the absence of a motion to make it more definite and certain, notwithstanding imperfections of form or the omission of specific allegations.

4. EQUITY—QUESTIONS ARISING ON APPEAL—LACHES.

The defense of laches may be considered by an appellate court, although not made the subject of an assignment of error.

5. SAME—RIGHT OF RELIEF—LACHES.

A delay of from one to two years before commencing suit to recover an interest in a mining claim after complainant's right had been denied

---

¶ 1. Mining partnerships, see note to G. V. B. Min. Co. v. First Nat. Bank, 35 C. C. A. 515.

· ¶ 2. See Partnership, vol. 38, Cent. Dig. § 3.

133 F.—14

does not alone constitute such laches as will bar him of relief in equity, where it does not appear that the defendants have been prejudiced thereby.

6. MINING CLAIMS—LOCATION BY ALIEN—VALIDITY.

The fact that a mining claim is located by an alien does not render the location illegal or void, but, at most, it is only voidable at the instance of the government; and a subsequent declaration of intention to become a citizen by a locator, or one having an interest in the claim, prior to the inception of any adverse rights, relates back to the date of the location or acquisition of the alien's interest, and validates the transaction. ﹨

7. SAME—AGREEMENT BETWEEN ALIENS TO LOCATE CLAIMS—VALIDITY.

An agreement between two aliens to acquire or locate mining claims in Alaska for their joint benefit is not void; nor does the fact of their alienage prevent one, who subsequently declared his intention to become a citizen, from enforcing the contract by recovering his interest in a claim located in the name of the other pursuant to such agreement.

8. PRELIMINARY INJUNCTION—REVIEW ON APPEAL.

An order granting a preliminary injunction which merely keeps the property in litigation in statu quo will not be disturbed on appeal unless it clearly appears that there has been an abuse of discretion.

Appeal from the District Court of the United States for the Second Division of the District of Alaska.

This is an appeal from an order of the court allowing an injunction pendente lite. The record contains over 589 pages of printed matter, and the briefs of counsel cover 222 pages, citing 250 or more authorities, upon which they rely. The testimony was all objected to by the respective counsel, and every thread thereof is elaborately discussed in the briefs. Upon all points there is a minute detail of every fact in the case, whether relevant or not. It has required considerable labor to digest the case, and so state it as to make the points raised by the appeal intelligible.

There are eight assignments of error, which read as follows: "(1) The court erred in making and entering said order granting said injunction, for the reason that the alleged contract of partnership sued on by plaintiffs is not in writing, and therefore void and invalid, under the provisions of sections 1044 and 1046 of chapter 101 of the Alaska Code of Civil Procedure, tit. 2 (31 Stat. 493). (2) * * * Because plaintiffs' alleged partnership contract was entirely in parol, and is therefore void under the statute of frauds and said chapter 101. (3) * * * Because it does not appear by the complaint and proofs made at the hearing that the plaintiffs are entitled to the relief demanded in their complaint as last amended, or any relief whatever. (4) * * * Because it appears that, under the pleadings and proofs considered, that plaintiffs cannot recover, and the alleged contract on which this action is brought is void. (5) * * * Because by the pleadings and proofs introduced in evidence at the hearing it appears that the plaintiffs are not entitled to any relief or judgment whatever. (6) * * * Because it appears by the pleadings and proofs that defendants are entitled to judgment dismissing this action. (7) * * * Because no probable cause was shown for the issuance of an injunction. (8) * * * Because there was no competent or sufficient evidence of the partnership contract relied on by plaintiffs." These assignments do not reveal the innumerable points and objections raised by counsel in the discussion thereof.

The pleadings are numerous, frequent amendments having been made thereto. Appellants question the sufficiency of the evidence, and also claim that the amended, supplementary, and substituted complaint does not state facts sufficient to constitute a cause of action, and is therefore wholly inadequate to support the application for the injunction. It is, among other things, claimed that the theory deducible from the complaint is insufficient to warrant the application for an injunction; that the facts alleged in the complaint are insufficient to establish either the creation or existence of a

mining partnership or of a common-law partnership. The specific objections urged thereto are numerous. Some of them may be briefly stated as follows: (1) The particular date of the location of the claim' is not stated; (2) the time of the existence of the partnership is limited to the year 1899, without any statement of facts that it was ever extended beyond that period; (3) that it states mere conclusions of law; (4) that no consideration for the partnership contract is alleged; (5) that it is not alleged that any partnership business was carried on between them prior to the location of the claim; (6) that it is not specifically alleged that there should be a sharing of profits and losses.

The facts as claimed by appellees, and set forth in their brief, are as follows: "Alfred Nilima and Johan P. Johansen were reindeer herders brought over from Norway by the United States government to Alaska. News of the finding of gold at Nome was brought to Eaton Station, District of Alaska. On or about the 20th day of March, 1899, Nilima and Johansen made a parol agreement that they would then and there become partners for the purpose of locating and operating mining property in the Nome Mining District, each to share with the other in whatever they found, and each putting an equal amount of capital into the partnership enterprise. After they had come to this understanding, they built a sled together, bought grub together, each paying half, and started together for Nome; each doing his share of pulling the sled, which contained their store of partnership property. When they reached Nome they were compelled to work separately, as they were both short of money, but they never abandoned the idea of prospecting together as soon as their circumstances would permit. Finally, on the 28th day of May, 1899, they went together to Glacier creek, and staked a claim, described as No. 1, above Snow Gulch, second tier of benches. There was only one claim staked for the two men that day, though they helped stake another claim for two other men who were with them. In the work of cutting stakes, prospecting for gold, marking out the lines, and setting up the stakes, both men did practically an equal amount of work. The location notice was signed by Johansen. The cost of recording the location notice was borne equally by Nilima and Johansen. The assessment work on the claim for the year 1900 was done by Nilima and his employé, Stenfjeld. Johansen, after gold was struck on an adjoining claim, repudiated the partnership right of Nilima to a half interest in the claim, and early in September, 1900, he refused to convey to Nilima his interest as a partner. Stenfjeld and some of the other appellees who derived title from Nilima began negotiations with appellants Erickson, Price, Guinan, and Soderberg about the sale of their interest in the claim. Negotiations with Stenfjeld et al. having ceased on July 25, 1901, Nilima et al. began suit against Johansen to establish their rights in the claim, and on the next day, July 26, 1901, a lis pendens was filed for record. On July 27, 1901, Johansen entered into a written contract to sell the claim to said appellants for $6,000, and $1,200 was then paid. The deed from Johansen to appellants, contemplated by the contract of sale above referred to, was not executed or recorded until September 26, 1901, and the balance of the purchase money, $4,800, was then paid to Johansen. The appellees demanded to be let into possession of the claim, and the demand was refused by appellants. The property is a very rich gold-bearing placer mine, and when water is available it can be worked rapidly. A large amount of gold has already been taken from the ground, and the appellants could, if permitted, work out the entire claim in one or two seasons, after which the claim would be valueless."

Johansen died March 5, 1902. George A. Shea was thereafter appointed administrator of the estate, and substituted for Johansen as a defendant. Stenfjeld and Olson purchased an interest in the property from Nilima.

The appellees have made condensed extracts from the testimony of Nilima, which, upon an examination of the entire record, we find to be substantially correct, as follows: "A. We said that Otto Greiner and Thorulf Kjelsberg would keep the one claim, and we keep the other. Q. Which claim was to be owned by Greiner and Kjelsberg? A. The one that had Kjelsberg's notice on. Q. Where you say, 'That other claim was to belong to us,' who do you

mean by 'us'? A. To me and Johan Peter Johansen. Q. Was you acquainted with any other persons living on Snow Gulch at that time? A. Thorulf Kjelsberg. Q. Are you acquainted with Otto Greiner? A. Yes, sir. Yes; on the 29th day of May I knew Thorulf Kjelsberg and Otto Greiner. They came to number one together. Q. Who was Otto Greiner and Thorulf Kjelsberg talking to? A. To me and to Johan Peter Johansen. They had heard that somebody had staked claims on the other side of Glacier, and asked us if we wanted to go with them. They asked if we wanted to go with Thorulf Kjelsberg and Otto Greiner to stake. Q. Now, then, when you started to go to stake the claims, who all went along? A. I and Johan Peter Johansen, Otto Greiner, and Thorulf Kjelsberg. Q. After you got through staking the first claim that you have spoken of, then what did you do? A. We began on the other claim, the other claim that me and Johan Peter Johansen had. Q. In staking the second claim, who did the staking? A. Johan Peter Johansen and I and Thorulf Kjelsberg and Otto Greiner. Q. Did you put any notice on the second claim you located? A. Yes, sir. Q. Who wrote the notice? A. Thorulf Kjelsberg. Q. Who signed the notice? As locator? A. Johan Peter Johansen. We spoke that, if there is anything in these two claims, there is enough, and, if there is nothing, it would do no more good to have the whole hill staked. Thorulf Kjelsberg and Otto Greiner were to have the other claim. It was agreed that Thorulf Kjelsberg and Otto Greiner were to have the one claim, and Johan Peter Johansen and I was to have the other. That we had already agreed to that before. Q. Now, when Johansen first came to you at Eaton Station, and asked you to go to Nome with him, what did he say to you? A. He said that, whatever we staked in one or another's name, it should be one-half to each. He asked me that, if you wouldn't come with him to Nome—come with him as a partner to Nome. Q. What did you say in reply to said Johan Peter Johansen's request that you go to Nome with him on this business? A. I promised to go. Q. What was then done with reference to the matters concerning which you had been talking with Johansen? A. We started to get ready for the journey. We made a sled and bought provisions. We bought $40 each, and we had some before. We made the sled ourselves, but we paid $2.50 for irons for the runners. We went to the woods and chopped the trees. We pulled it [sled] ourselves. We had no deer or dogs. Johan Peter Johansen came to me and asked me if I wouldn't give him one and a quarter for my share for recording of the claim. Q. And what did you do? A. I gave one dollar and twenty-five cents—one-half of my share. Q. Who did you give it to? A. To my partner Johan Peter Johansen. I hired Ole Stenfjeld. Q. What to do? A. Do the assessment work on the claim, and look after other things. Q. What claim? A. The one that my partner located was one; the same that my partner's location was on. Q. What do you mean by your partner's location? A. I mean that the claim that we staked with my partner. Q. Did you ever pay any money to any one for doing assessment work on the claim on Glacier creek for the year 1900? A. Yes, sir. Q. Who did you pay money to? A. Ole Oleson. Q. What was the usual fee charged in June, 1899, for recording a location notice? A. Two dollars and a half. I was working because I had interest in the claim. I employed a man to do our part of the work. Q. Why did you do this? A. I did the work so as to keep the claim for myself and Johan Peter Johansen. Q. Who did you employ for this purpose? A. Ole Stenfjeld."

This general statement is deemed sufficient to present the legal questions raised by counsel.

R. R. Bigelow, J. W. Dorsey, R. M. F. Soto, James E. Fenton, N. Soderberg, and Ira D. Orton, for appellants.

Albert H. Elliott, John L. McGinn, and William T. Love, for appellees.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge (after making the foregoing statement). It will be our endeavor to confine the discussion in this case to as few points as possible, and at the same time to cover all material questions that have been properly raised and presented by counsel. It may be said generally that the evidence of Nilima, and the facts set forth in the amended, supplementary, and substituted complaint, make out at least a prima facie case on the part of the appellees; and, unless the legal objections raised thereto by appellants destroy the force and effect thereof, there is enough in the record to sustain the action of the court below in issuing the injunction. Some of the reasons which sustain this view will be hereafter referred to.

1. The agreement of partnership, as alleged and proven, does not fall within the character of contracts required by the Alaska Code to be in writing in order to be valid. The agreement does not come within the provisions of the statute of frauds. The rule is well settled that an agreement between two or more persons to explore the public domain, and discover and locate a mining claim or claims, for the joint benefit of the contracting parties, does not fall within the statute of frauds, and need not be in writing. If, in pursuance of the agreement, one of the parties locates the claim in his own name, he holds the legal title to the interests of the others in trust for them. Murley v. Ennis, 2 Colo. 300; Hirbour v. Reeding, 3 Mont. 15, 20, 23; Meylette v. Brennan, 20 Colo. 242, 38 Pac. 75; Meagher v. Reed, 14 Colo. 335, 351, 367, 24 Pac. 681, 9 L. R. A. 455; Gore v. McBrayer, 18 Cal. 582, 587; Settembre v. Putnam, 30 Cal. 490; Moritz v. Lavelle, 77 Cal. 10, 18 Pac. 803, 11 Am. St. Rep. 229; Welland v. Huber, 8 Nev. 203; 2 Lind. on Mines, § 797. This is not a partnership to deal in lands. It is alleged in the complaint to be a "prospecting and mining partnership." But it matters not what name is given to it by the parties; it must be left to the court to determine its general nature from the facts. Whether it is called a "contract," an "agreement," or a "partnership," the law steps in, and from the facts determines the rights of the respective parties thereunder. It will not be necessary to follow the counsel as to when or at what place the agreement was executed. In the very nature of the case, no independent argument can be based on the talk at Eaton Station. The entire steps taken by the parties must be considered. Whatever was done in furtherance of the common purpose, understanding, and agreement must be treated as an entire or continuous transaction, so far as their rights and obligations in respect to the enterprise are concerned. If by words, acts, and deeds they joined together in a common purpose, and agreed to share equally in the enterprise, they were, in a certain sense, partners, and such a partnership may be formed without any written articles between the parties. In determining whether the relation between the parties to an oral agreement constitutes a partnership, their intention, as is disclosed by the nature and effect of the whole agreement, and acts done thereunder, must govern. The mutual agreement between Nilima and Johansen was not, strictly speaking, a mining copartnership, in the full sense of that term, or an ordinary common-law partnership, or a "grubstake" agreement; and some of the principles of law announced in such cases are not specially applicable to the case in hand, and need not be discussed.

2. We are of opinion that the complaint states facts sufficient to constitute a cause of action in equity; that the objections urged thereto are more to the form than to the substance. Some of the objections made thereto are purely technical; others are based upon the theory of appellants that the suit was a mining copartnership, pure and simple; and others, that the existence of a partnership and date of location of the claim are uncertain. A motion to have made it more certain and definite would doubtless have been allowed.

In Pomeroy's Code Rem. (3d Ed.) § 549, the author said:

"The true doctrine to be gathered from all the cases is that if the substantial facts which constitute a cause of action are stated in a complaint or petition, or can be inferred by reasonable intendment from the matters which are set forth, although the allegations of these facts are imperfect, incomplete, and defective—such insufficiency pertaining, however, to the form rather than to the substance—the proper mode of correction is not by demurrer, nor by excluding evidence at the trial, but by a motion before the trial to make the averments more definite and certain by amendment. * * * If, instead of alleging the issuable facts, the pleader should state the evidence of such facts, or even a portion only thereof, unless the omission was so extensive that no cause of action at all was indicated, or if he should aver conclusions of law in place of fact, the resulting insufficiency and imperfection would pertain to the form rather than to the substance, and the mode of correction would be by a motion, and not by a demurrer."

Section 97 of the Alaska Code of Civil Procedure (31 Stat. 347) declares that:

"The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party."

3. It is claimed that appellees were guilty of laches in commencing and in prosecuting the suit. What are the facts? The complaint does not state the time when the Columbia claim (in controversy) was located, but it does show that it was located prior to August 20, 1900. Nilima and Johansen left Eaton Station in the spring of 1899. The complaint was filed July 25, 1901. It may have been within one year, and could not have been over two years, from the time of the location of the claim. The application for the injunction was made June 9, 1903. These facts as to time do not seem to bring the case within the rule of laches, and no question as to laches seems to have been urged in the court below. There is no assignment of error upon this point. It has, however, been held that the objection of laches may be taken without pleading the same as a defense. Sullivan v. Railroad Co., 94 U. S. 806, 811, 24 L. Ed. 324; Richards v. Mackall, 124 U. S. 183, 187, 8 Sup. Ct. 437, 31 L. Ed. 396; Penn Ins. Co. v. Austin, 168 U. S. 685, 697, 18 Sup. Ct. 223, 42 L. Ed. 626. It may therefore be assumed that it may be considered without reference to the assignments of error. It is well settled that if the delay in the assertion of rights is not adequately explained, and if such circumstances have intervened in the condition of the adverse party as to render it unjust to them, a court of equity might afford relief where a shorter time than that prescribed by the statute of limitations has elapsed without suit. From the record in this case, it does not appear that the relative positions of Nilima and Johansen had in any way been changed to the prejudice of appellants by the delay. Townsend v. Vanderwerker, 160 U. S. 171, 186, 16 Sup.

Ct. 258, 40 L. Ed. 383; 18 Am. & Eng. Ency. L. (2d Ed.) 101, and authorities there cited. The suit was brought before Johansen's death, and appellants purchased the property from Johansen with knowledge of Nilima's equitable claims, and they ought not to be allowed to plead laches for a less time than prescribed by the statute of limitations. They were all, with the exception of R. L. Price, encouraging Johansen in his refusal to execute the deed of a one-half interest in the property to Nilima.

4. The next contention of appellants is that the contract in question was made between aliens, and cannot be enforced; it being claimed that the enforcement of the contract involves the violation of the statutes of the United States as to who can locate mining claims. If the contract between the parties was illegal, having for its object a violation of the law, it cannot be judicially enforced. 15 Am. & Eng. Ency. L. (2d Ed.) 935, and authorities there cited. The record shows that, at the time the Columbia claim was located, both Nilima and Johansen were aliens. It also shows that on April 28, 1900, Nilima, in the superior court of the city and county of San Francisco, Cal., in accordance with the provisions of law upon the subject, regularly declared his intention to become a citizen of the United States. At this date Johansen still recognized Nilima as his partner, and no intervening rights of others to the claim had accrued.

The statute of the United States provides that:

"All valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, are hereby declared to be free and open to exploration and purchase * * * by citizens of the United States and those who have declared their intention to become such, under regulations prescribed by law." Rev. St. § 2319 [U. S. Comp. St. 1901, p. 1424].

The fact that a mining claim is located by an alien can only be taken advantage of by the government. The location is not illegal or void, but, at most, is only voidable by the act of the government. A subsequent declaration of intention by a locator, or one having an interest in the claim, prior to the inception of any adverse rights, relates back to the date of the location, or acquisition of the alien's interests therein, and validates the transaction. Fairfax's Devisee v. Hunter's Lessee, 7 Cranch, 603, 619, 3 L. Ed. 453; Craig v. Radford, 3 Wheat. 594, 599, 4 L. Ed. 467; Governeur's Heirs v. Robertson, 11 Wheat. 332, 356, 6 L. Ed. 488; Osterman v. Baldwin, 6 Wall. 116, 122, 18 L. Ed. 730; Manuel v. Wulff, 152 U. S. 505, 511, 14 Sup. Ct. 651, 38 L. Ed. 532; St. Louis M. Co. v. Montana M. Co., 171 U. S. 650, 655, 19 Sup. Ct. 61, 43 L. Ed. 320; McKinley M. Co. v. Alaska M. Co., 183 U. S. 563, 572, 22 Sup. Ct. 84, 46 L. Ed. 331; Crœsus M., M. & S. Co. v. Colorado L. & M. Co. (C. C.) 19 Fed. 78, 82; Billings v. Aspen M. & S. Co., 51 Fed. 338, 342, 2 C. C. A. 252; Lone Jack M. Co. v. Megginson, 82 Fed. 89, 93, 27 C. C. A. 63; Tornanses v. Melsing, 109 Fed. 710, 47 C. C. A. 596.

In McKinley M. Co. v. Alaska M. Co., supra, the court said:

"The meaning of Manuel v. Wulff is that the location by an alien, and all the rights following from such location, are voidable, not void, and are free from attack by any one except the government."

In Lone Jack M. Co. v. Megginson, supra, this court said:

"But if the right of Hanley as a locator could now be brought in question upon the ground that he was an alien at the time when the location was made, we are of the opinion that his subsequent declaration of intention to become a citizen related back to the date of his location, and, in the absence of adverse rights attaching prior to the date of the actual declaration of intention, operated to validate the location."

The laws applicable to Alaska declare that aliens may acquire and hold lands. By the act of Congress of March 2, 1897, c. 363, 29 Stat. 618 [U. S. Comp. St. Supp. 1903, p. 326], which was in force at the time the agreement in question was made, aliens, or persons who shall become bona fide residents of the United States, were authorized to acquire title to lands or mining claims by purchase. There is nothing in these acts which in any manner attacks the validity of the agreement in question.

Under the views we have expressed, and the principles of law announced in the decisions we have cited, the agreement of the parties, the location of the claim, and the enforcement of Nilima's rights therein, were not and are not in violation of the law. The position of appellants upon these points cannot be sustained. Courts of equity will not declare illegal or void a contract or agreement to do that which the law does not prohibit, but in fact expressly admits.

5. In the consideration of the questions involved in this case, we have not lost sight of the fact that the appeal herein is taken from an order of the court allowing an injunction pendente lite; that in such cases it is not necessary to make such a complete and perfect showing as would entitle the applicant to full relief at the final hearing of the case upon its merits; that it is enough, if the court can find from the pleadings, the evidence, and affidavits in support thereof, a case which presents a proper subject for investigation in a court of equity. The court is then authorized to exercise its sound discretion in issuing an injunction. Especially is this true in a case like the one in hand, where the issuance of an injunction only keeps the property in statu quo during the litigation, until the final hearing. In all such cases appellate courts are not inclined to interfere unless it clearly appears that the court below abused its discretion. Blount v. Société, 53 Fed. 98, 101, 3 C. C. A. 455; Workingmen's Amalgamated Council v. United States, 57 Fed. 85, 6 C. C. A. 258; Duplex P. P. Co. v. Campbell P. P. Co., 69 Fed. 250, 252, 16 C. C. A. 220; Thompson v. Nelson, 71 Fed. 339, 18 C. C. A. 137; 16 Am. & Eng. Ency. L. (2d Ed.) 345; 10 Ency. Pl. & Pr. 983–985, and authorities there cited; 2 High on Inj. § 1696.

We have purposely refrained from reviewing the evidence offered at the trial, or expressing any opinion as to the weight thereof. These are matters to be determined upon the final hearing.

Our conclusion is that the court below was authorized by the pleadings and the proofs, as shown by the record herein, to act in the premises, and that in granting the injunction it did not violate any established rule of law or principle of equity.

The order appealed from is affirmed, with costs.