## CLARK v. BARLOW et al.

### No. 7831.

United States Court of Appeals for the District of Columbia.

Decided Aug. 18, 1941.

Writ of Certiorari Denied Nov. 10, 1941.

See 62 S.Ct. 188, 86 L.Ed. ——.

Carl L. Ristine, of Washington, D. C., for appellant.

Joseph R. McCuen, of Washington, D. C., for appellee Barlow.

Edward M. Curran, U. S. Atty., and William S. Tarver, Asst. U. S. Atty., both of Washington, D. C., for appellees Morgenthau and Julian.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

MILLER, Associate Justice.

In 1915 appellant, a lawyer, and appellee, an inventor, entered into a contract concerning an aerial torpedo bomb "and patents or any improvements or additions * * * to said bomb or patents as well as * * * moneys * * * received from the sale of said bomb or as royalty" therefor. Subsequently appellee abandoned his original application for a patent and denied that any effective contract still existed between himself and appellant. However, he continued his experiments with aerial bombs; and as the years went

by he continued in disagreement with appellant as to whether the 1915 contract covered his new discoveries; appellant contending that the bombs, applications for patents and patents which are the subject of the present suit were improvements upon and additions to the original bomb; appellee contending that they were not.

In January, 1918, appellee entered into a contract by which he assigned the bombs, patents and applications for patents, here involved, to Marlin-Rockwell Corporation. Thereafter, in October, 1918, and in April, 1921, appellee instituted two actions in New York; one in the State Supreme Court of New York and the other in the United States District Court for the Southern District of New York; against Marlin-Rockwell Corporation, for accountings and for money due under the contract of January, 1918. Appellant was interpleaded as a party defendant in each of the two actions; he appeared and filed a counterclaim in each; alleging that under the 1915 contract he was entitled to a one-half share in the inventions and patents which had been transferred to the Marlin-Rockwell Corporation, and in income and royalties therefrom; and claiming an accounting for all royalties and income therefrom then due, or which thereafter might become due from any source. The action in the New York state court was tried in February, 1921, and the federal court action in January, 1924, but both were still pending when, on December 8, 1924, appellant signed the following stipulation which was thereupon filed in both actions: "It is hereby stipulated, that the defendant, John F. Clark, settles all claims against Lester P. Barlow, by the payment to him or his attorneys by Barlow in the sum of $12,000. Said Clark hereby releases the balance of said funds, and further covenants and agrees to execute and deliver to Lester P. Barlow a general release, of all claims and causes of action whatsoever. Upon payment of said money, said Clark through his attorney will sign a consent to discontinue the above actions without costs to any party as against the others. The sum of $12,000 to be paid upon the delivery of the general release by the defendant, Clark." Pursuant to the terms of the stipulation, appellant received the specified $12,000 and executed the following release: " 'To All Whom These Presents Shall Come or may concern, greeting; know ye, That John F. Clark, of the City of Los Angeles, County of Los Angeles, and State of California, for and in consideration of the sum of Twelve Thousand Dollars lawful money of the United States of America, to me in hand paid by Lester P. Barlow, the receipt whereof is hereby acknowledged, have remised, released and forever discharged and by these Presents do for myself heirs, executors and administrators, remise, release and forever discharge the said Lester P. Barlow, his heirs, executors and administrators, of all and from all, and all manner of action and actions, cause and causes of actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever in law or in equity, which against him, I, John F. Clark, ever had, now have or which my heirs, executors or administrators, hereafter can, shall or may have for, upon or by reason of any matter, cause, or thing whatsoever from the beginning of the world to the day of the date of these presents. * * *' "

In the meantime, in 1923, the Marlin-Rockwell Corporation had become financially embarrassed and had gone into receivership. In August of that year it had assigned to appellee—in settlement of all claims which he might have against it—a large number of foreign and domestic patents including those here involved, together with all claims which it might have against the United States of America or any other government, partnership, corporation or individual, for use or infringement of the patents involved in the present case, as well as numerous other patents. The assignment from Marlin-Rockwell Corporation, so far as it concerned claims against the United States, fell within the prohibition of the federal statute[1] and hence was invalid. However, in 1927, Congress conferred jurisdiction on the Court of Claims of the United States to determine the amount due on the claim here involved;[2] and, after that determination had been made,[3] Congress, on September 6, 1940, awarded to appellee $592,719.21.[4]

---

[1] R.S. § 3477, 31 U.S.C.A. § 203.

[2] Act of March 3, 1927, 44 Stat. [Part 3] 1844

[3] Barlow v. United States, 87 Ct.Cl. 287. See also, Id., 82 Ct.Cl. at 360.

[4] Private Law No. 555, 76th Cong., 3d Sess. (1940).

Relying upon his contract of 1915, and for the purpose of enforcing an equitable lien in this award, appellant, thereafter, sued appellee, together with the Secretary of the Treasury and the Treasurer of the United States, in the District Court of the United States for the District of Columbia. The two officials answered; alleged that they had no interest in the controversy, except as stakeholders; and asked the court to instruct them as to the disposition which should be made of the fund. Both appellant and appellee moved for a summary judgment. The trial court denied appellant's motion and granted that of appellee.

Several issues which were presented to the trial court are renewed on this appeal. The most important of these concerns the effect of the stipulation and release executed by appellant in 1924. He now contends that they were void, and hence ineffective to bind him because, he says, they were procured by false and fraudulent representations, and by concealment of facts which appellee was under a fiduciary duty to disclose. The following facts, found by the trial court, lend color to appellant's contention: (1) Although the reassignment from Marlin-Rockwell Corporation to appellee was made on August 3, 1923, more than a year prior to the filing of the stipulation and release executed by appellant, it was not filed in the United States Patent Office until November 8, 1927, more than four years after its execution and delivery, and approximately three years after the appellant's release was executed; (2) in the trial of the action in the New York state court in 1921, appellee, on cross-examination, testified as set out in the margin,[5] but, apparently contrary to appellee's answer as then given, (3) he had received from Marlin-Rockwell Corporation portions of royalties paid by the United States, (4) he did not own the patents involved in this suit, (5) although appellee wrote a letter to the Acting Secretary of War in which he offered, on request, to waive any royalties which might become due to him through future contracts, the offer was refused by the Acting Secretary of War, and

at the time of his cross-examination appellee had not released or relinquished all rights to royalties from the United States Government; (6) while appellee knew of the rejection of his proposal to waive, neither appellant nor his attorneys knew anything about the letter or its rejection.

However, the court also found that (1) the cross-examination of appellee, during which the answers noted were given, was for the purpose of ascertaining from what sources, if any, *other than* the Marlin-Rockwell Corporation, patent royalties were due; (2) appellant had, at the time of the cross-examination full and complete knowledge of the 1918 contract between appellee and Marlin-Rockwell Corporation and he, himself, introduced it into evidence at the same trial as that at which the cross-examination occurred; (3) appellant knew that sales of bombs were to be made by Marlin-Rockwell Corporation to the United States Government; (4) appellant also knew, at the time the testimony of appellee was given, that appellee had received from Marlin-Rockwell Corporation portions of royalties paid by the United States to Marlin-Rockwell, because the suits then in litigation—and to which appellant was a party—involved, among other matters, sums due to appellee arising out of royalties paid to Marlin-Rockwell Corporation by the United States; (5) although appellee did not own the patents, they were owned by Marlin-Rockwell Corporation, by virtue of the 1918 contract, of which appellant was fully informed; (6) the testimony of appellee was not intended to and did not deceive or mislead appellant.

These latter findings clearly dispose of appellant's contention that appellee made false or fraudulent representations to him. There remains, however, his contention that appellee concealed facts which he was under a fiduciary duty to disclose; particularly as concerns (1) his failure, for one year prior to and three years after appellant's release was executed, to file the assignment from Marlin-Rockwell Corporation in the United States Patent Office; and (2) his failure to testify, on cross-exami-

---

5 "Q. Have you received anything. for your depth bombs? A. Nothing.

"Q. Have you received anything for any aerial bombs from the Government? A. No.

"Q. No royalties? A. I waived my royalties to the Secretary of War—I wrote him a letter.

"Q. Did you ever get patents on any of these articles? A. Yes.

"Q. Do you own the patents now? A. Yes, they are here.

"Q. Do you own patents in any foreign countries now? A. No."

nation, that his offer to waive royalties had been rejected by the Acting Secretary of War. There are several answers to this contention. In the first place, whatever fiduciary relationship there may have been, as a result of the contract of 1915, clearly no such relationship existed either at the time of the trial in 1921, or at the time of the reassignment in 1923. The trial court found that in 1916, and again in 1918, appellee advised appellant that the 1915 contract did not relate to and was not intended to relate to "any of the bombs, applications for patents thereon, or patents thereon which are the subject matter of the case at bar." This alone was sufficient to put appellant on notice that if he thought he had any rights he should take steps to protect them and that appellee had repudiated any previously existing fiduciary relation.[6]

In the second place, as the trial court found, appellee, in 1918, assigned to Marlin-Rockwell Corporation his entire interest in the bombs, the invention thereof, and the application for patents thereon, and thereafter the patents upon the bombs were issued to that Corporation. Of this assignment appellant was fully informed prior to the year 1921. Also, in 1918, and again in 1921, when appellee commenced actions against Marlin-Rockwell Corporation, appellant was interpleaded as a party defendant—adverse to appellee; in his counterclaim in each action appellant claimed a one-half share in the inventions, patents, income and royalties; and appellee, in each of the two actions, denied that appellant had any interest of any kind, character or description. It was after all this had occurred that the first alleged concealment took place. At that time, on trial in the New York state court, appellant and appellee were adversary parties; each was represented by counsel; the issues between them had been defined by pleadings in which the very existence of facts out of which any fiduciary relationship might have grown, were denied. Yet, appellant relies upon answers then given by appellee under cross-examination to show concealment upon which he, as one occupying a fiduciary relationship, is entitled to rely.

Again, appellee's answers on cross-examination fail to show concealment, in any event. Anyone who is familiar with court-room practice is well aware of the rapid-fire manner in which cross-examination takes place. At the New York trial, appellee was asked whether he had received anything for aerial bombs from the Government. Appellant's counsel, in asking the question, well knew that Marlin-Rockwell had received something, and that appellee had received a portion thereof. He and appellant both understood, therefore, that appellee's answer excepted payments made to Marlin-Rockwell Corporation. It was then that appellee volunteered the statement: "I waived my royalties to the Secretary of War * * * I wrote him a letter." The conclusion is inescapable that appellant knew this statement also excepted payments made to Marlin-Rockwell Corporation by the Government, which payments had been in part distributed to appellee and which constituted the very substance of the trial then under way. Moreover, appellee's statement, thus volunteered, even as it related to other royalties on future contracts, far from constituting concealment, was, instead, a revelation of information. It amounted to an invitation to inquire further as to the nature and contents of the letter. But appellant's counsel did not accept the invitation. He, not appellee, was in control of the examination, and he chose to go forward to another subject: "Did you ever get patents on any of these articles?"

So far as concerns the reassignment, and appellee's failure to file it in the United States Patent Office, it will be remembered that this occurred in 1923, approximately two years after the trial of the action in the New York state court, in which appellee and appellant appeared as adversary parties, and five or six years after appellee had advised appellant of his adverse position concerning the 1915 contract. There is no basis here, therefore, upon which to urge concealment of facts which appellee was duty bound to reveal. Appellee consistently maintained his position from 1916 on, that appellant had no interest in the inventions here involved; he denied, on several occasions, that the 1915 contract was still operative; he put appellant on notice, in a variety of ways, that his position was adverse to that of appellant; he left no basis upon which appel-

---

[6] Cleaveland v. Richardson, 132 U.S. 318, 10 S.Ct. 100, 33 L.Ed. 384; Mallory v. Leach, 35 Vt. 156, 166, 82 Am. Dec. 625, 628; Banner v. Rosser, 96 Va. 238, 246, 31 S.E. 67, 70. Cf. Ferguson v. Lowery, 54 Ala. 510, 25 Am.Rep. 718.

lant could assume or rely upon the continuance of a fiduciary relationship.[7] "One cannot close his eyes to the obvious and then claim to be deceived."[8] Appellant, by his letters to appellee, as well as by joining issue with him on at least two occasions, in the actions of 1918 and 1921, indicated his recognition of the changed relationship.

■■ One who relies upon fraud, misrepresentation, or concealment, must sufficiently allege and prove it.[9] In the present case there is no basis upon which such a

defense can be maintained. Consequently, appellant is bound by his stipulation and release. That release, in turn, is comprehensive and inclusive. The law favors the settlement of litigation and the compromise of disputed claims.[10] If such a release, made under the circumstances of the present case, could be repudiated, there would be no end to litigation.[11] It is not necessary for us to consider the other points urged by appellant.

Affirmed.

[7] Andrus v. St. Louis Smelting & Refining Co., 130 U.S. 643, 647, 9 S.Ct. 645, 646, 32 L.Ed. 1054: "The law does not afford relief to one who suffers by not using the ordinary means of information, whether his neglect be attributable to indifference or credulity, nor will industrious activity in other directions, to the neglect of such means, be of any avail."

[8] Del Rio v. Ulen Contracting Corp., 5 Cir., 94 F.2d 701, 703.

[9] Lalone v. United States, 164 U.S. 255, 257, 17 S.Ct. 74, 41 L.Ed. 425; Public Motor Service, Inc. v. Standard Oil Co., 69 App.D.C. 89, 91, 99 F.2d 124, 126; Security Investment Co. v. Garrett, 3 App.D.C. 69, 76; Equitable Life Assur. Soc. v. Johnson, 6 Cir., 81 F.2d 543, 547.

[10] Williams v. First Nat. Bank, 216 U.S. 582, 595, 30 S.Ct. 441, 54 L.Ed. 625; St. Louis Mining & Milling Co. v. Montana Mining Co., 171 U.S. 650, 656, 19 S.Ct. 61, 43 L.Ed. 320; McMahon v. Matthews, 48 App.D.C. 303, 309: "The law encourages the compromise of disputes, and looks with favor on all proper efforts in that direction."; Miller v. Pyrites Co., Inc., 4 Cir., 71 F.2d 804, 810, certiorari denied, 293 U.S. 604, 55 S.Ct. 121, 79 L.Ed. 696. See Tulsa City Lines, Inc. v. Mains, 10 Cir., 107 F.2d 377, 380.

[11] Cf. Hennessy v. Bacon, 137 U.S. 78, 85, 11 S.Ct. 17, 34 L.Ed. 605; The Katie M. Hagan, D.C.E.D.Pa., 98 F. 995, 996; Randall v. Port Huron, St. C. & M. C. Ry., 215 Mich. 413, 423, 184 N.W. 435, 438.