T.C. Memo. 2008-144


UNITED STATES TAX COURT


FPL GROUP, INC. AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.  5271-96, 6653-00,    Filed May 28, 2008.
             10811-00.[1]


<u>K. Lee Blalack</u> and <u>Chris Faiferlick</u>, for petitioner.

<u>Jill A. Frisch</u> and <u>Halvor N. Adams, III</u>, for respondent.


MEMORANDUM OPINION


RUWE, <u>Judge</u>:  This opinion involves petitioner's motions to

enforce settlement agreement (motions) filed pursuant to Rule 50[2]

---

[1] By order dated Jan. 17, 2007, these cases were
consolidated for trial, briefing, and opinion on the motions.

[2] Unless otherwise indicated, all Rule references are to the
                                        (continued...)

in three cases involving petitioner's tax years 1988 through 1992 (docket No. 5271-96), 1994 and 1995 (docket No. 6653-00), and 1996 (docket No. 10811-00). Petitioner's motions raise the following issues: (1) Whether the parties entered into an enforceable settlement agreement wherein they agreed to use a specified methodology to determine which of certain expenditures should be capitalized and which should be currently deductible as repairs (the repairs issue); (2) if respondent did not agree to an enforceable settlement methodology, whether statements made by one of respondent's attorneys are sufficient to compel respondent to settle the repairs issue using the aforementioned methodology; or, in the alternative, (3) whether respondent should be estopped from denying that he agreed to an enforceable settlement of the repairs issue.

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the attached exhibits are incorporated by this reference. FPL Group Inc. (petitioner), is a corporation organized and existing under the laws of the State of Florida with its principal office in Juno Beach, Florida.

---

[2](...continued)
Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the years in issue.

Background

This Court has already issued two opinions in docket No. 5271-96 pertaining to the repairs issue for the years 1988 through 1992. In that docket petitioner claimed that it had improperly capitalized many expenditures that should have been deducted as repairs. For the tax years 1988 through 1992 petitioner alleged in its second amended petition that respondent erred in failing to allow it to deduct $210,925,534 of repair expenses that it had capitalized in determining the tax liabilities set forth in its consolidated Federal income tax returns for those years.[3]

In the first of our prior opinions in docket No. 5271-96 we granted respondent's motion for partial summary judgment, holding that petitioner's method of accounting for tax purposes during the years 1988 through 1992 was the same method that it used for Federal Energy Regulatory Commission (FERC) and Florida Public

---

[3] For the tax years 1994 and 1995, petitioner alleged in its petition in docket No. 6653-00 that respondent erred in failing to allow it to deduct $62,024,968 of repair expenditures that it had deducted and $54,625,486 of repair expenditures that it had capitalized in determining the tax liabilities set forth in its consolidated Federal income tax returns for those years. For the tax year 1996 petitioner alleged in its petition in docket No. 10811-00 that respondent erred in failing to allow it to deduct $11,131,371 of repair expenditures that it had deducted and $15,676,793 of repair expenditures that it had capitalized in determining the tax liabilities set forth in its consolidated Federal income tax return for that year. No notice of deficiency was issued for 1993, and it is therefore not a year before the Court although a refund claim was filed for that year and remains pending.

Service Commission (FPSC) regulatory purposes and for financial accounting purposes. See FPL Group, Inc. & Subs. v. Commissioner, 115 T.C. 554, 575-576 (2000) (FPL I). We further held that petitioner's claim for additional deductions for repairs was an attempt to make an impermissible change in its method of accounting for which petitioner had failed to secure the consent of the Secretary as required by section 446(e). Id. at 576.[4]

Our Opinion in FPL I was issued in December 2000. Other issues in docket No. 5271-96 remained unresolved, and counsel for both parties continued dealing with each other. In late spring

---

[4] In a subsequent opinion involving the same docket, we denied petitioner's motion for partial summary judgment where petitioner argued that if its method of accounting for tax purposes had been the same method it used for regulatory and financial accounting purposes, then respondent changed petitioner's method to the "method of accounting" required by sec. 1.162-4, Income Tax Regs. See FPL Group, Inc. & Subs. v. Commissioner, T.C. Memo. 2005-210 (FPL II). Petitioner also argued that respondent abused his discretion by denying petitioner's retroactive "protective request" for a change in method of accounting, which was filed on Apr. 10, 2001, for the years 1988 through 1996. Id. FPL II incorporated our Opinion in FPL I and served as a "sequel" to FPL I. Id. In FPL II we declined to "accept petitioner's characterization of section 1.162-4, Income Tax Regs., as a 'method of accounting' distinguishable from petitioner's method". Id. We rejected petitioner's argument that adjustments respondent made or allowed during the examination were tantamount to changing petitioner's method of accounting. Id. Finally, we held that petitioner failed to demonstrate disparate treatment compared with competitors and found no abuse of discretion in respondent's refusal to grant petitioner's retroactive "protective request" for a change in method of accounting for the years 1988 through 1996. Id.

of 2002 there was a change in the management of respondent's attorneys responsible for petitioner's pending cases.  The new managers were interested in exploring a settlement of the repairs issue.  William Merkle (Mr. Merkle), the IRS Associate Area Counsel (Strategic Litigation), who was stationed in Chicago, assumed supervisory control over the three docketed cases that are the subject of petitioner's motions.  Mr. Merkle had authority to settle the repairs issue in those cases.

In June 2002 Mr. Merkle met with petitioner's counsel, Robert Carney (Mr. Carney), and with petitioner's senior manager of tax compliance and audits, Donald Chasmar (Mr. Chasmar).  They discussed the repairs issue and determined that they would explore a possible settlement.  Mr. Merkle's willingness to explore settlement was in accord with the interests of his supervisor, Area Counsel James Lanning, who advocated attempting to settle the issue, including those years subject to our Opinion in FPL I.

One of Mr. Merkle's new subordinates was Robert Shilliday (Mr. Shilliday), a Special Trial Attorney with more than 30 years of experience as an IRS attorney who was stationed in Atlanta and had been working on issues involving petitioner since 2000.  Mr. Shilliday was assigned to negotiate on respondent's behalf regarding the repairs issue.

All of petitioner's and respondent's representatives understood that only Mr. Merkle had the authority to settle the repairs issue on respondent's behalf.  Mr. Shilliday was authorized to discuss with petitioner's representatives any potential terms of a settlement and to communicate any proposals to Mr. Merkle.  Likewise, if Mr. Merkle expressed views that he wanted petitioner to know regarding settlement of the repairs issue, Mr. Merkle expected Mr. Shilliday to communicate them to petitioner.

Mr. Shilliday met with Messrs. Chasmar and Carney in August 2002 at petitioner's corporate headquarters in Juno Beach, Florida, to discuss the repairs issue and attempt to find a basis for settlement.  The parties discussed various alternative methodologies but concluded that the major component methodology had the most promise for settlement.  Dick Engstrom (Mr. Engstrom), a supervisor of property plant accounting for petitioner, joined them toward the end of the meeting after the focus of settlement moved to the major component methodology.

The major component methodology is described in Mr. Shilliday's Settlement Status Report (SSR) as follows:

> The definition of major component is to be controlled by part 116 of the Federal Energy Regulatory Commission Regulations governing FPL's utility accounting practices.  A copy of this regulation is enclosed.  Under the major component settlement methodology, if an entire blower or fan, for example, is being replaced on a piece of equipment, the work order involved will be classified as capital.  If on

the other hand the seals on the blower or fan are being replaced, that work order would be classified as a repair.  The reason FPL capitalized the blower or fan seals for utility accounting purposes is that Commission Regulations allow major component sub-accounts to be established at the discretion of the utility.  These sub-accounts break the major component down into various minor sub-components.

Whereas the method of accounting that petitioner used for regulatory, financial, and tax accounting purposes from 1988 through 1992 that we described in our Opinion in FPL I allowed flexibility, see FPL Group, Inc. & Subs. v. Commissioner, supra at 556-557, the major component methodology proposed for settlement purposes would require classifying expenditures listed in petitioner's work orders in strict accord with the list of retirement units contained in part 116 of the FERC regulations.  Under this method, if an expenditure was for an entire retirement unit listed in part 116 of the FERC regulations, i.e., a major component, it would be capitalized.  If an expenditure was for a part of a listed retirement unit, it would be considered a repair and be deducted.

To provide Mr. Shilliday with examples of the application of the major component methodology during the August 2002 meeting, Mr. Engstrom took 19 work orders selected by Mr. Shilliday and demonstrated how each work order would be classified.  After Mr. Engstrom completed this analysis, Mr. Shilliday informed Mr. Chasmar that he thought the methodology was promising and that he was willing to recommend it to Mr. Merkle.  As of the August 2002

meeting the parties understood that it would be necessary for approximately 1,500 work orders to be reviewed in order to have a settlement on the repairs issue.

Messrs. Carney and Chasmar informed Mr. Shilliday that petitioner was prepared to use the methodology. However, they explained to Mr. Shilliday that petitioner did not want to perform the work necessary to classify the 1,500 disputed work orders unless Mr. Merkle first agreed to use the major component methodology.

At the conclusion of the August 2002 meeting Mr. Shilliday volunteered to put together a written recommendation of the proposal to submit to Mr. Merkle for approval and agreed to provide Mr. Chasmar with a copy of the proposal to review in order to ensure that it accurately reflected the understanding reached at the August 2002 meeting.[5]  After the August 2002

---

[5] Mr. Chasmar testified:

> A [Mr. Chasmar].  * * * Mr. Shilliday stated that he would be putting together a proposal to submit to Mr. Merkle for Mr. Merkle's approval and that he would forward a copy to me to review to make sure that it's an accurate representation of the agreement that we had reached at the meeting so it was presented factually correct.
>
> Q [Petitioner's counsel at trial].  And did you in fact at some point after the meeting receive a draft of his written recommendation?

(continued...)

meeting Mr. Shilliday prepared a proposed SSR and sent a copy to Mr. Chasmar. Mr. Chasmar reviewed the proposal for accuracy and discussed its contents with Mr. Shilliday. Mr. Chasmar also made changes to the draft that Mr. Shilliday incorporated into the proposal. Mr. Shilliday wanted to make sure that he accurately understood petitioner's position before he finalized the SSR to send to Mr. Merkle.[6] Mr. Chasmar did not suggest that the SSR

---

[5](...continued)

      A. I did.

      Q. Did you review it?

      A. I did.

      Q. Did you have any conversations with Mr. Shilliday about it?

      A. Yes.

      Q. Okay. And after those conversations, what was your understanding about what would happen next?

      A. That Mr. Shilliday was going to finalize the document and submit it to Mr. Merkle for his review, and I asked Mr. Shilliday if he would please forward me a copy when he completed finalizing it.

      Q. Why did you ask Mr. Shilliday to provide you a copy of this written recommendation he was providing to Mr. Merkle?

      A. Because I wanted to have it for my records.

[6] Mr. Carney had authorized Mr. Shilliday to communicate directly with Mr. Chasmar, and most of the communications

(continued...)

should specifically require the parties to enter into a binding agreement to use the major component methodology before petitioner's classification of the 1,500 disputed work orders, and the finalized SSR submitted to Mr. Merkle contains no such requirement. Mr. Chasmar understood that Mr. Shilliday would subsequently submit the SSR containing the recommendation of a settlement proposal to Mr. Merkle for his review. Mr. Shilliday understood that the SSR reflected petitioner's proposal, though that was not stated in the SSR and the SSR was not signed by Mr. Chasmar or any other representative of petitioner. Mr. Shilliday sent the SSR to Mr. Merkle on or about August 27, 2002.[7] Mr. Shilliday also sent a copy of the SSR to Mr. Chasmar.

In the second paragraph on the first page of the SSR, Mr. Shilliday wrote:

> Proposal for Settlement: It is proposed that each Florida Power work order in controversy be inspected by FPL's utility regulation accounting department, and a division of these work orders, between capital and repair, be made on the basis of whether the item of equipment being replaced is a major component of the equipment or not.

---

[6](...continued)
regarding the repairs issue were between Messrs. Shilliday and Chasmar. Mr. Carney had no more substantive communications with Mr. Merkle or Mr. Shilliday regarding the resolution of the repairs issue until 2003.

[7] A copy of the final Settlement Status Report (SSR) is attached as an appendix. Although the SSR states that "A copy of * * * [part 116 of the FERC regulations] is enclosed", the copy was not submitted to the Court or entered into evidence.

This was Mr. Shilliday's effort to communicate to Mr. Merkle what he believed to be petitioner's proposal. However, the SSR nowhere states that it is petitioner's proposal.

The SSR contains the following recommendation:

> It is recommended that you [Mr. Merkle] approve the major component settlement system analysis and authorize FPL to conduct the survey necessary to complete the classification of the work orders in controversy. When completed, I will check FPL's analysis to ensure its accuracy.

The SSR does not state that FPL would not perform the work necessary to classify the 1,500 work orders unless Mr. Merkle first agreed to settle using the major component methodology. The SSR lacks final adjustment numbers and does not address how any disputes regarding the proper classification of work orders would be resolved. The SSR does not include a signature line for Mr. Merkle's approval.

After sending the finalized SSR to Mr. Merkle, Mr. Shilliday telephoned Mr. Merkle in late August or early September 2002 in order to discuss the proposal. Mr. Shilliday testified that he explained to Mr. Merkle that petitioner wanted Mr. Merkle to agree to settle in accordance with the major component methodology before petitioner performed the analysis of the 1,500 work orders in order to classify them as capital expenditures or repair expenses. According to Mr. Shilliday, Mr. Merkle told him in a subsequent telephone conversation to "go ahead with the deal". Mr. Shilliday testified that he understood this to mean

that Mr. Merkle agreed to use the methodology described in the SSR for settlement purposes.

In contrast, Mr. Merkle described his recollection of his conversation with Mr. Shilliday as follows:

[Mr. Shilliday] described the settlement methodology that he wanted to follow with regards to settling the repairs issue. He said he wanted to follow a FERC regulatory method. That was the predominant portion of the discussion.

He said he wanted my approval of that analysis so he can go forward and complete it, and then he also said that Mr. Chasmar was refusing to do any further analysis on the issue unless I agreed to settle the case using this methodology.

At that point in time I sort of laughed either out loud or to myself and said I can't do that, and I believe I told * * * [Mr. Shilliday] to go ahead with his conducting the analysis of the settlement methodology because otherwise there would be no settlement.

When asked at trial whether he interpreted the SSR as an offer from petitioner, Mr. Merkle testified as follows:

Well, as it was explained to me * * * with regards to the discussion on that status report and the methodology * * * [Mr. Shilliday] said here's the methodology we want to follow. I said it looks rational and that we needed to look at it further to determine if it was reasonable with regards to the amounts at question, what are the amounts at issue. And he also said that Mr. Chasmar was not willing to go forward with doing the work to determine -- or actually doing the work with regards to the analysis.

At that point in time I didn't, I did not interpret Mr. Chasmar's remarks as a settlement offer because I did not consider Mr. Chasmar a representative of the Petitioner that I was supposed to be dealing with or as a representative of the Petitioner that should be dealing on this case with Respondent.

I had one other point to make.  This was more in my experience what I've seen in the many cases I've worked on as a taxpayer's employees and staff complaining about doing work on a case.  And this has happened * * * on occasion with my experiences with representation between myself and taxpayers.  So I considered this as nothing more than disgruntled talk by Mr. Chasmar.  And I just did not understand it as a proposed settlement offer from the counsel of record in this case.

Mr. Merkle acknowledged that he told Mr. Shilliday to "proceed as proposed".  When asked at trial whether this was in reference to the proposal outlined in the SSR, Mr. Merkle stated:

What I was telling * * * [Mr. Shilliday] to do was to proceed with his analysis, since there was further analysis to be done.  I was not telling him to proceed with a proposal, but with the analysis, which was what I thought the status report was all about.

Mr. Shilliday testified that he called Mr. Chasmar sometime between the end of August and early in the first week of September 2002 and told him that "the methodology had been authorized by Mr. Merkle".  Mr. Chasmar testified that Mr. Shilliday's verbatim statement was that Mr. Merkle had given "the green light to go ahead with the deal."  Mr. Chasmar informed Mr. Shilliday that he would contact Mr. Engstrom and ask him to perform the classification analysis on the 1,500 disputed work orders.  Mr. Chasmar told Mr. Shilliday that he would be in contact once the work was completed to schedule a followup meeting to review the results of Mr. Engstrom's analysis.

None of the participants in the aforementioned telephone conversations between Messrs. Shilliday and Merkle and between

Messrs. Shilliday and Chasmar made any contemporaneous notes or memoranda of those conversations.  Mr. Chasmar did not request that Mr. Shilliday provide any written verification from Mr. Merkle as to the alleged agreement.  Neither Mr. Carney nor Mr. Chasmar sent a confirming letter regarding Mr. Merkle's alleged approval of petitioner's alleged offer to settle in accordance with the major component methodology.

The process of classifying the work orders cost petitioner $10,000.  When Mr. Engstrom finished his analysis of the work orders, Mr. Chasmar arranged a meeting with Mr. Shilliday at petitioner's Juno Beach office on September 23-24, 2002, to review the results.  The parties met for 2 days while Mr. Shilliday reviewed petitioner's classifications of the 1,500 work orders.  Mr. Shilliday requested changes to some classifications of the work orders.  Mr. Chasmar agreed to change some of the classifications that Mr. Shilliday disputed, and Messrs. Shilliday and Chasmar eventually came to an understanding on all of the classifications.

Following the analysis of the work orders, petitioner prepared a calculation of the results of the analysis with regard to the years 1988 through 1997, including the nondocketed years 1993 and 1997.  On October 16, 2002, Mr. Shilliday received this calculation which purported to be a complete computation of the net effect of the capital versus repair adjustment.  Mr. Chasmar

understood that the calculation faxed to Mr. Shilliday on October 16, 2002, was to be incorporated by Mr. Shilliday into a document that would contain the proposed settlement numbers that Mr. Shilliday would submit to Mr. Merkle for Mr. Merkle's approval. Only Mr. Merkle had authority to approve the classifications for purposes of computing final settlement figures.

On November 4, 2002, Mr. Merkle e-mailed a spreadsheet updating the status of all the FPL issues to several people within the IRS, including Mr. Shilliday. The spreadsheet described the repairs issue as an "Open Issue" as opposed to a "Resolved", "Pending," or "Computational" issue. This spreadsheet was attached to an e-mail from Mr. Merkle, the body of which contained the following sentence: "I have also verbally reviewed this list with Bob Carney and we are in general agreement with the items at issue and status, i.e. Resolved, Dispute, Pending trial." Mr. Shilliday did not reply to Mr. Merkle's e-mail.

Beginning on or about October 11, 2002, and through the spring of 2003, Mr. Merkle communicated with IRS employees from the examination team, technical advisers, the industry issue resolution task force for the accounting method issue, and the Chief Counsel's national office regarding the potential settlement of the repairs issue. All expressed opposition to the settlement.

Mr. Shilliday drafted a Counsel Settlement Memorandum (CSM) that included the results of petitioner's calculation for Mr. Merkle.[8]  Mr. Shilliday shared the factual portion of the proposed CSM on the repairs issue with petitioner.  The CSM set forth the results of the proposed settlement and took into account 1993 and 1997 even though the parties understood that Mr. Merkle had no authority to settle those years, which were not then before the Tax Court.[9]

Mr. Shilliday prepared two versions of the CSM, one dated on or about November 15, 2002, and a second that he sent to Mr. Merkle on December 2, 2002.  Both versions contained proposed settlement amounts for additional repair deductions and amounts for depreciation associated with the additional repair deductions.  The first version did not analyze the settlement in the context of FPL I, particularly with regard to the accounting

---

[8] A Counsel Settlement Memorandum (CSM) is a written document stating the basis of settlement of an issue.  A CSM follows a format consisting of a statement of the issue, a statement of the resolution, a discussion of the relevant facts, a discussion of the applicable law, and if the issue is to be settled other than upon the merits, a discussion of the hazards of litigation.  A CSM is signed by the attorney and then countersigned, following an "Approved" line, by the managing or approving official.

[9] Petitioner claimed a refund, which was pending, for 1993. Mr. Shilliday had no discussions with petitioner's representatives regarding how the proposed 1993 deficiency would be assessed or whether assessment was barred.  The discussion of the dollar tax impact for 1997 includes a reference to the fact that the claim was pending in the IRS's Appeals Office.

method issue.[10]  Mr. Merkle requested that Mr. Shilliday revise

the first CSM to address the Court's Opinion in FPL I.  Mr.

Shilliday complied with Mr. Merkle's request by adding a section

labeled "Issue 2" and sent the revised version to Mr. Merkle on

December 2, 2002.  The final version of the CSM includes the

following statement:

> Proposal for Settlement:  It is proposed that each
> Florida Power work order in controversy be reviewed,
> and a division of these work orders, between capital
> and repair, be made on the basis of whether the item of
> equipment being replaced is a major component of the
> equipment or not.

The CSM closes with Mr. Shilliday's recommendation "That the

proposal for settlement be accepted" and contains a signature

line for Mr. Merkle's approval.  Mr. Merkle never approved the

settlement figures in the CSM and never signed the CSM.

Mr. Merkle informed Mr. Shilliday by telephone in December

2002 that Mr. Shilliday was being transferred out of Mr. Merkle's

group effective January 12, 2003.  At some point after Mr.

Shilliday's transfer, Mr. Merkle contacted Mr. Shilliday and

indicated that he should have no further involvement in

petitioner's case.

In early 2003 Mr. Carney contacted Mr. Merkle.  Mr. Merkle

informed Mr. Carney that he was still reviewing the settlement

proposal.  Mr. Merkle requested that Mr. Carney draft a history

---

[10] Respondent was not able to locate a copy of the first
version of the CSM.

of the repairs issue in the form of a letter that described the factual and procedural issues that existed before Mr. Merkle assumed responsibility for the case.

Mr. Carney sent a letter to Mr. Merkle on February 14, 2003. Mr. Carney's letter referred to the "proposed settlement" of the repairs issue and stated that "In the event that the pending settlement proposal is not finalized, additional litigation will be required in the Tax Court to review Respondent's refusal to grant * * * [petitioner's protective request to change its method of accounting]". The letter did not mention an existing settlement regarding methodology, nor did it refer to potential litigation to enforce such an agreement.

On or about March 20, 2003, the parties scheduled a meeting in Mr. Carney's office in Washington, D.C., for April 16, 2003, to discuss the repairs issue and other outstanding items. On March 27, 2003, Mr. Merkle sent a letter to Mr. Carney in which he stated that the proposed settlement of the repairs issue did not adequately reflect the "hazards of litigation" from respondent's perspective. Following the receipt of Mr. Merkle's March 27, 2003, letter, Mr. Carney contacted Mr. Merkle by telephone on or about April 1, 2003. During the call Mr. Merkle told Mr. Carney that potential settlement would be kept under consideration for the April 16, 2003, meeting between the parties.

On April 7, 2003, Mr. Carney e-mailed James Higgins (Mr. Higgins), petitioner's vice president of tax, Mr. Chasmar, and Suanne Fechtmeyer (Ms. Fechtmeyer) a first and then a revised draft of a proposed letter in response to Mr. Merkle's March 27, 2003, letter.  Both drafts of the letter referred to a "proposed settlement" of the repairs issue and to a "prior agreement" to a settlement methodology.  Mr. Higgins subsequently e-mailed Mr. Chasmar and Ms. Fechtmeyer and attached a revised draft of the letter in which Mr. Higgins added the following sentence: "Petitioner requests that Respondent explain why it is reneging on its prior agreement."  The mention of a "prior agreement" in these drafts represents the first written statement, internally or otherwise, alleging that the parties had an agreement regarding settlement of the repairs issue.

In the final version of Mr. Carney's letter, dated April 9, 2003, Mr. Carney made statements regarding the alleged methodology agreement and requested that respondent "exercise good faith and abide by the prior agreement."  The "prior agreement" to which Mr. Carney referred was the alleged agreement to use the major component methodology.

The parties met on April 16, 2003, at Mr. Carney's office in Washington, D.C.  Mr. Carney began the meeting by explaining petitioner's position that Mr. Merkle had entered into an agreement on methodology.  Mr. Merkle advised petitioner's

representatives that respondent would not settle the repairs issue in the first docket, docket No. 5271-96, which was the subject of our Opinion in FPL I. Mr. Merkle stated that he would keep the possibility of settlement open for 10 days with regard to the years after the first docket in order to confer with the national office and others within the IRS who had knowledge of the repairs issue.

Following the April 2003 meeting, Mr. Merkle consulted with various constituencies familiar with the repairs issue within the IRS, all of whom indicated they were not in favor of a settlement with petitioner.

## Discussion

The first issue we must decide is whether the parties entered into an enforceable settlement agreement wherein they agreed to use a specified methodology to determine which of certain expenditures should be capitalized and which should be deductible as repairs. General principles regarding the enforcement of settlements in the Tax Court were set out in Dorchester Indus., Inc. v. Commissioner, 108 T.C. 320, 330 (1997) (quoting Manko v. Commissioner, T.C. Memo. 1995-10), affd. without published opinion 208 F.3d 205 (3d Cir. 2000), as follows:

> "For almost a century, it has been settled that voluntary settlement of civil controversies is in high judicial favor. Williams v. First Natl. Bank, 216 U.S. 582, 595 (1910); St. Louis Mining & Milling Co. v.

Montana Mining Co., 171 U.S. 650, 656 (1898).  A valid settlement, once reached, cannot be repudiated by either party, and after the parties have entered into a binding settlement agreement, the actual merits of the settled controversy are without consequence.  This Court has declined to set aside a settlement duly executed by the parties and filed with the Court in the absence of fraud or mutual mistake.  Stamm Intl. Corp. v. Commissioner, 90 T.C. 315 (1988); Spector v. Commissioner, 42 T.C. 110 (1964).  However, a court will not force a settlement on parties where no settlement was intended.  Autera v. Robinson, 419 F.2d 1197 (D.C. Cir. 1969).

"A settlement is a contract and, consequently, general principles of contract law determine whether a settlement has been reached.  Robbins Tire & Rubber Co. v. Commissioner, 52 T.C. 420, 435-436, supplemented by 53 T.C. 275 (1969).  A prerequisite to the formation of a contract is an objective manifestation of mutual assent to its essential terms.  Heil v. Commissioner, T.C. Memo. 1994-417; 17A Am. Jur. 2d, Contracts, secs. 27 and 28 (1991); 1 Williston on Contracts, sec. 3:5 (4th ed. 1990).  Mutual assent generally requires an offer and an acceptance.  17A Am. Jur. 2d, Contracts, sec. 41 (1991).  'An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'  1 Restatement, Contracts 2d, sec. 24 (1981).

"In a tax case, it 'is not necessary that the parties execute a closing agreement under section 7121 in order to settle a case pending before this Court, but, rather, a settlement agreement may be reached through offer and acceptance made by letter, or even in the absence of a writing.'  Lamborn v. Commissioner, T.C. Memo. 1994-515.  Settlement offers made and accepted by letters are enforced as binding agreements.  Haiduk v. Commissioner, T.C. Memo. 1990-506; see also Himmelwright v. Commissioner, T.C. Memo. 1988-114."

Petitioner argues that Mr. Merkle orally accepted petitioner's settlement proposal to use the major component methodology to determine how to classify approximately 1,500

disputed expenditures as either capital expenditures or deductible repair expenses. According to petitioner, its proposal was conveyed to Mr. Merkle through Mr. Shilliday's written SSR and Mr. Shilliday's oral telephone explanation to Mr. Merkle that petitioner's proposal to perform the classification of 1,500 work orders was contingent on Mr. Merkle's up-front agreement to use the methodology without first knowing the results that it might produce. The evidence upon which petitioner primarily relies is the SSR and the testimony of Messrs. Shilliday and Chasmar.

In their testimony both Messrs. Shilliday and Chasmar indicated a common understanding that petitioner did not want to perform the analysis of the 1,500 work orders without some agreement between the parties that the major component methodology was going to be used to classify the work orders upon which the settlement figures would be determined. Both also understood that the proper classification of each of the work order expenditures could still be disputed by Mr. Merkle. Both Messrs. Shilliday and Chasmar testified that they worked together to incorporate the terms of the settlement proposal into the written SSR, and that Mr. Chasmar was given the opportunity to review the draft of the SSR before its submission to Mr. Merkle to make sure that the proposal was accurate. Mr. Shilliday testified that after submitting the finalized SSR to Mr. Merkle,

Mr. Shilliday explained in a telephone conversation with Mr. Merkle that petitioner wanted Mr. Merkle to agree to use the methodology for settlement purposes before petitioner performed the analysis of the 1,500 work orders. Mr. Shilliday testified that Mr. Merkle told him that he would look over the material. Mr. Shilliday testified that in a subsequent telephone conversation Mr. Merkle told him to go ahead with the deal, and Mr. Shilliday conveyed this response to Mr. Chasmar.

Mr. Merkle testified that when Mr. Shilliday told him of petitioner's wish to have an up-front agreement, he told Mr. Shilliday that he would not agree to be bound to use the methodology without first knowing the results of its application. Both Messrs. Shilliday and Merkle agree that Mr. Merkle told Mr. Shilliday: "Go ahead with the deal" or "Proceed as proposed" or words to that effect. Mr. Shilliday then told Mr. Chasmar "that Mr. Merkle had given the green light to go ahead with the deal."

The primary conflict is between Mr. Merkle's testimony that he told Mr. Shilliday that he would not agree to use the methodology for settlement purposes without first knowing the results of its application and Mr. Shilliday's testimony that he believed that Mr. Merkle agreed with the proposal to use the methodology for settlement before knowing the results of its application. We recognize that recollections of witnesses regarding specific conversations can produce inconsistencies and

that specific words and phrases can sometimes convey different meanings depending on the context in which they are uttered. In these situations, it is useful to look to contemporaneously written documents and the contemporaneous actions of the parties at key points.

The key document in this controversy is the SSR, which states, in pertinent part, as follows:

> Proposal for Settlement: It is proposed that each Florida Power work order in controversy be inspected by FPL's utility regulation accounting department, and a division of these work orders, between capital and repair, be made on the basis of whether the item of equipment being replaced is a major component of the equipment or not.

The SSR contains a sample classification of 19 of the approximately 1,500 disputed work orders using the proposed methodology. The analysis in the SSR indicates that 11 work orders totaling $2,676,768 should be capitalized and 8 work orders totaling $1,403,903 should be classified as repairs. In the SSR Mr. Shilliday warns that "These results may not be representative of the entire body of contested work orders, since only one plant was involved for a short period of time and that

plant was a nuclear plant."[11]  The SSR contains the following
recommendation:

> It is recommended that you approve the major
> component settlement system analysis and authorize FPL
> to conduct the survey necessary to complete the
> classification of the work orders in controversy.  When
> completed, I will check FPL's analysis to ensure its
> accuracy.

Mr. Chasmar reviewed the "proposal" in the SSR before its
submission to Mr. Merkle in order to be sure that both parties
understood what was being proposed.  The SSR indicates that it is
Mr. Shilliday's proposal, and it was signed by Mr. Shilliday.
The SSR does not state that it contains petitioner's settlement
proposal or that the proposal was intended to bind both parties
to the methodology regardless of the results of its application.
The SSR fails to state that petitioner would not perform the work
necessary to classify the 1,500 work orders unless Mr. Merkle
first agreed to settle on the basis of the proposed methodology.

Mr. Shilliday believes that Mr. Merkle gave oral approval to
petitioner's proposal to use the methodology to settle the
repairs issue.  However, nothing in the SSR or any other
documents prepared by the representatives and employees of

---

[11] The analysis of the 19 sample work orders resulted in
approximately 66 percent of the amount in dispute being
capitalized and approximately 34 percent being expensed as
repairs.  Subsequently, the analysis in the CSM of all of the
approximately 1,500 work orders resulted in approximately 52
percent of the amount in dispute being capitalized and
approximately 48 percent being expensed as repairs.

petitioner or respondent during the approximately 7 months between Mr. Shilliday's telephone conversation with Mr. Merkle in September 2002 and the various drafts of Mr. Carney's letter to Mr. Merkle in April 2003 states that either party thought there was a binding agreement to use the methodology for settlement of the repairs issue.  Considering that over $350 million of deductions was at stake in the repairs issue for the docketed years addressed in this opinion, one might reasonably expect some written confirmation, or at least contemporaneous internal memoranda or writings, memorializing a settlement.  After significant pretrial discovery, no such documents materialized.

Petitioner's representatives and employees apparently never made a contemporaneous written note or memorandum of petitioner's understanding of a binding agreement or its terms.  Petitioner's counsel never sent a contemporaneous written confirmation of petitioner's understanding of a settlement and its terms to respondent.  Only after nearly 7 months did petitioner's counsel write to Mr. Merkle alleging that the parties had a prior agreement.  Until that point petitioner's counsel consistently referred to a "proposed settlement" on both its internal documents and in correspondence with respondent.

Similarly, respondent never sent anything in writing to petitioner to confirm a methodology agreement with petitioner.  No internal writings prepared by respondent's representatives,

including Mr. Shilliday, stated that there had been a settlement as to methodology. To the contrary, in a spreadsheet documenting the status of all of the FPL issues, the repairs issue was considered an "Open Issue" until at least November 4, 2002, well after Mr. Merkle's alleged consent to a settlement agreement occurred. As we have already mentioned, this spreadsheet was attached to an e-mail Mr. Merkle sent to, among others, Mr. Shilliday, and contained the following pertinent phrase: "I have also verbally reviewed this list with Bob Carney and we are in general agreement with the items at issue and status, i.e. Resolved, Dispute, Pending trial." Mr. Shilliday did not contact Mr. Merkle to dispute the "open" status of the repairs issue on the spreadsheet. Finally, the last page of the proposed CSM that Mr. Shilliday prepared on the repairs issue indicates that a settlement had yet to be finalized: "Conclusion: That the proposal for settlement be accepted." This was followed by a signature line for Mr. Merkle. It is undisputed that Mr. Merkle never signed the proposed CSM on the repairs issue.

As the moving party, petitioner bears the burden of proof. Petito v. Commissioner, T.C. Memo. 2000-363; see also Pietanza v. Commissioner, 92 T.C. 729, 736 (1989), affd. without published opinion 935 F.2d 1282 (3d Cir. 1991); S. Cal. Loan Association v. Commissioner, 4 B.T.A. 223 (1926). After considering the entire record in this matter, we find that the evidence is insufficient

for us to conclude that the parties entered into a binding agreement to use the major component methodology to settle the repairs issue.

Petitioner argues in the alternative that Mr. Shilliday's statement to Mr. Chasmar that Mr. Merkle had given "the green light" is binding on respondent, regardless of whether Mr. Merkle actually agreed to use the methodology.  Petitioner was aware that Mr. Shilliday did not have authority to bind respondent and that Mr. Merkle was the only person who had that authority. Unauthorized acts taken by Government agents do not bind the Government.  United States v. Killough, 848 F.2d 1523, 1526 (11th Cir. 1988); Gardner v. Commissioner, 75 T.C. 475, 477-478 (1980); Webb v. Commissioner, T.C. Memo. 1994-549 (and cases cited therein), affd. without published opinion 68 F.3d 482 (9th Cir. 1995).[12]

_____

[12] Petitioner relies heavily on Sun Oil Co. v. Behring Props., Inc., 480 F.2d 310 (5th Cir. 1973).  In Sun Oil a party to a land sale made another party his agent for purposes of assenting to changes in the contract transferring title.  The agent, in alleged disregard of instructions from the party, agreed to an extension of time for executing the contract.  The Court of Appeals for the Fifth Circuit held that because the third party dealing with the agent had no notice regarding the limitations on the agent's authority, and nothing in the course of dealing or the relative positions of the parties gave the third party any indication that the agent exceeded its authority, the party was bound by the agent's unauthorized representations.

Petitioner argues that Mr. Shilliday had authority to communicate Mr. Merkle's acceptance of petitioner's offer to petitioner and that petitioner had no notice that Mr. Shilliday's
(continued...)

As previously mentioned, the facts do not establish that Mr. Merkle approved a settlement agreement. It is also not clear that Mr. Shilliday conveyed to Mr. Merkle an "offer" from petitioner to enter into a binding agreement to use the major component methodology regardless of the results it might produce. The SSR does not state that FPL would not do the work necessary to classify the work orders unless Mr. Merkle first agreed to a settlement using the major component methodology. Mr. Chasmar reviewed the SSR in order to make sure that the proposal therein was accurate. Mr. Chasmar did not suggest that language be inserted into the SSR that would require a binding agreement by the parties to use the major component methodology before petitioner's classification of the 1,500 disputed work orders, nor did the SSR address how any disputes regarding the proper classification of work orders would be resolved. Neither party produced contemporaneously prepared documentation indicating that a binding settlement had been made. Under the circumstances, the fact that Mr. Shilliday told Mr. Chasmar that Mr. Merkle had given "the green light to go ahead with the deal" is too

---

[12](...continued) communications regarding Mr. Merkle's alleged acceptance were inaccurate or unauthorized. The instant case is distinguishable from Sun Oil in that the third party in that case had no notice regarding the limitations of the agent's authority to assent to changes. Petitioner knew that Mr. Shilliday never had authority to assent to anything. At best his authority was limited to conveying Mr. Merkle's assent.

ambiguous to create a binding contract to settle, even if Mr. Shilliday was authorized to convey Mr. Merkle's response to a proposal by petitioner.

Petitioner also argues that, in the absence of a contract or apparent authority, respondent is estopped from refusing to adopt the major component methodology. "'[T]he doctrine of equitable estoppel is applied against the Government "with the utmost caution and restraint."'" Kronish v. Commissioner, 90 T.C. 684, 695 (1988) (quoting Boulez v. Commissioner, 76 T.C. 209, 214-215 (1981), affd. 810 F.2d 209 (D.C. Cir. 1987)). The elements necessary to succeed on an estoppel claim against the Government are as follows:

> The following conditions must be satisfied before equitable estoppel will be applied against the Government: (1) A false representation or wrongful, misleading silence by the party against whom the opposing party seeks to invoke the doctrine; (2) an error in a statement of fact and not in an opinion or statement of law; (3) ignorance of the true facts; (4) reasonable reliance on the acts or statements of the one against whom estoppel is claimed; and (5) adverse effects of the acts or statement of the one against whom estoppel is claimed. See Kronish v. Commissioner, supra at 695, and cases cited therein; Foam Recycling Associates v. Commissioner, T.C. Memo. 1992-645. Thus, estoppel requires a finding that a claimant relied on the Government's representations and suffered a detriment because of that reliance. Schuster v. Commissioner, 312 F.2d 311 (9th Cir. 1962), affg. 32 T.C. 998 (1959), affg. in part and revg. in part First Western Bank & Trust Co. v. Commissioner, 32 T.C. 1017 (1959); Boulez v. Commissioner, supra; Estate of Emerson v. Commissioner, 67 T.C. 612, 617-618 (1977); Underwood v. Commissioner, 63 T.C. 468 (1975), affd. 535 F.2d 309 (5th Cir. 1976).

Norfolk S. Corp. v. Commissioner, 104 T.C. 13, 60 (1995), affd. 140 F.3d 240 (4th Cir. 1998).

The elements of estoppel are not met in this case. While there have been some misunderstandings, petitioner's argument that it reasonably relied on a false representation while in ignorance of the true facts is inconsistent with the previously discussed evidence. The testimony indicates that the statements made at the time of the alleged agreement were ambiguous. This, combined with the contemporaneous actions of the parties and the lack of any contemporaneous documentation memorializing an alleged agreement on methodology, indicates that there was no false representation on which petitioner reasonably relied.

In addition to the general requirements, in order to establish estoppel against the Government, there must be detrimental reliance by the party claiming the benefit of the doctrine. Boulez v. Commissioner, supra at 215. Estoppel applies against the Government only if, among the other required elements, the Government's wrongful act causes a serious injustice. Watkins v. U.S. Army, 875 F.2d 699, 707 (9th Cir. 1989). Relative to more than $350 million of claimed deductions at stake in this case, the $10,000 petitioner spent to perform the analysis of the 1,500 work orders is a minor cost to petitioner, insufficient to be considered a "serious injustice". Accordingly, "we conclude that the acts of reliance by petitioner

do not involve the level of detriment necessary to bring the instant case within the category of those 'rare instances' where respondent should be estopped." Boulez v. Commissioner, supra at 216; see also Estate of Emerson v. Commissioner, 67 T.C. 612, 618 (1977).

Finally, the terms of the methodology agreement alleged by petitioner are too indefinite to form an enforceable settlement agreement. Indefiniteness and uncertainty as to any of the essential terms of an agreement have often been held to prevent the creation of an enforceable contract. 1 Corbin, Corbin on Contracts, sec. 4.1, at 525 (1993). A contract whose terms are so indefinite, uncertain, and incomplete that the reasonable intentions of the contracting parties cannot be fairly and reasonably distilled from them is not enforceable. Nelson Bros., Inc. v. Commissioner, T.C. Memo. 1991-52 (citing Cook v. Brown, 393 So. 2d 1016, 1018 (Ala. Civ. App. 1981)). When the evidence clearly shows, either by reason of definite language or otherwise, that the only (and the complete) subject matter that is under consideration is left for further negotiation and agreement, there is no contract. 1 Corbin, supra at 531.

It is undisputed that Mr. Merkle retained authority to approve or dispute any of the classifications of the work orders that had been tentatively agreed to by petitioner and Mr. Shilliday. It is also undisputed that Mr. Merkle never approved

the classifications and never agreed to the final settlement figures proposed in the CSM, and there was no agreed mechanism for resolving disputes as to the application of the methodology. Without an agreement on the proper classification of the 1,500 work orders, an essential element of an enforceable settlement agreement was missing.[13]

To reflect the foregoing,

An appropriate order will be issued denying petitioner's motions to enforce settlement agreement.

---

[13] Petitioner's counsel suggest that disputes over the proper classification of any of the 1,500 work orders could be resolved by the Court. However, this would place the Court in the position of deciding key issues that the parties were to decide as part of the alleged settlement and could likely involve a trial over potentially complicated issues. A trial was what the alleged settlement was intended to avoid. When Mr. Shilliday was asked why he had not prepared a CSM in September instead of the SSR he testified: "I just don't think, at least I don't do settlements in theory. We have to reduce the theory to a number otherwise the theory is useless to the Court. The parties have to, especially in a settlement, we have to do the numbers."

APPENDIX


CC:LM:RFP:SLATL:TL-5271-96; 25084-96; 6653-00;     August 27, 2002
10811-00
RJShilliday


SETTLEMENT STATUS REPORT

The Repair v. Capital Issue

In re:  FPL Group Inc. v. Commissioner
Docket Numbers 5271-96; 25084-96; 6653-00; 10811-00


ISSUE:  Are costs incurred by FPL to perform work on
its utility equipment deductible as ordinary,
unnecessary [sic] business expenses under Section 162
or must they be capitalized under Sections 263 and
263A?  This is not an issue involving "heavy
maintenance visits" nor does it involve the "plan of
rehabilitation doctrine."  This case involves the
substitution or replacement of parts on FPL'S utility
equipment involving both major components of that
equipment and portions of the major components, which
are not significant portions of the equipment that
materially increase the value and substantially prolong
the useful life of the equipment.

Proposal for Settlement:  It is proposed that each
Florida Power work order in controversy be inspected by
FPL's utility regulation accounting department, and a
division of these work orders, between capital and
repair, be made on the basis of whether the item of
equipment being replaced is a major component of the
equipment or not.

     The definition of major component is to be
controlled by part 116 of the Federal Energy Regulatory
Commission Regulations governing FPL's utility
accounting practices.  A copy of this regulation is
enclosed.  Under the major component settlement
methodology, if an entire blower or fan, for example,
is being replaced on a piece of equipment, the work
order involved will be classified as capital.  If on
the other hand the seals on the blower or fan are being
replaced, that work order would be classified as a

repair.  The reason FPL capitalized the blower or fan
seals for utility accounting purposes is that
Commission Regulations allow major component
sub-accounts to be established at the discretion of the
utility.  These sub-accounts break the major component
down into various minor sub-components.

For illustration of the workings of this
settlement methodology, a group of work orders
previously supplied to the Internal Revenue Service by
FPL was selected by the undersigned to be tested under
the classification system.  The nonconsecutive work
orders are numbered 1011 to 1642.  The classification
of these work orders under the major component system
is as follows:

| Work Order Number | Equipment | Amount | Capital or Repair Classification |
|---|---|---|---|
| 1011 | Instrument | | C |
| 1093 | Flowmeter | | C |
| 1104 | Seals | $163,062 | R |
| 1111 | Turbo Changer | $53,718 | R |
| 1155 | Pump | | C |
| 1227 | Rotating Assy. | $38,137 | R |
| 1241 | Motor | | C |
| 1281 | Strainers | $300,000 | R |
| 1373–1374 | Tank | | C |
| 1412 | Valve | | C |
| 1429 | Snubbers | $350,000 | R |
| 1465 | Breaker Switch | | C |
| 1522 | Monitor | | C |
| 1523 | Control | | C |
| 1529 | Bearing | $113,168 | R |
| 1546 | Panel | $298,700 | R |

| 1564 | Motor | | C |
|---|---|---|---|
| 1570 | Governor | | C |
| 1642 | Impeller | $87,118 | R |

Eleven of the twenty work order items are major components of equipment resulting in the capitalization of work in an amount totaling $2,676,768. The remaining nine work orders were classified as repairs for a total of $1,403,903. These results may not be representative of the entire body of contested work orders, since only one plant was involved for a short period of time and that plant was a nuclear plant.

It is recommended that you approve the major component settlement system analysis and authorize FPL to conduct the survey necessary to complete the classification of the work orders in controversy. When completed, I will check FPL's analysis to ensure its accuracy.

Basis for Decision: The prototype for the major component system is Rev. Rul. 2001-4, 2001-1 C.B. 295. This ruling involves the aircraft industry and concludes that in situation three described in the ruling, the taxpayer is required to capitalize the cost of all work performed on the aircraft because the work involved replacements of major components. The other underpinning of the ruling, with respect to situation three, is that significant portions of substantial structural parts were also replaced, but that situation is not presented in FPL since only replacements of components are involved.

The adoption of a hard and fast rule that anything other than the replacement of a major component, given the detailed list of major components as developed by the Federal Energy Regulatory Commission, is a system that can be used by the taxpayer for classification purposes and monitored by Internal Revenue Service without interjecting extensive subjective analysis into the problem solving arena. The elimination of FPL's minor component sub-accounts for tax accounting purposes preserves FERC's utility accounting in its purest form by disregarding FPL's discretionary sub-accounts for tax purposes.

Previously, all attempts at settlement by reference to the general capitalization requirements of the code and regulations have resulted in failure. What is needed to resolve this issue in FPL is a relatively simple and objective system which eliminates engineers and utility expert witnesses from the accounting process. A copy of Revenue Ruling 2001-4 is enclosed for your convenience, together with work order 1523 as an example of a typical FPL record, which is driving the classification process.

I will be happy to discuss the background of this issue with you at your convenience together with the change of the accounting method issue which has been the subject of so much rancor between the parties. Under this settlement approach, the change of accounting method issue will not be addressed and a permanent system of accounting will await the completion of the IRR process.


ROBERT J. SHILLIDAY, JR.
Special Trial Attorney
CC:  LN:RFP:SLCHI:ATL